No. 24-4546

IN THE
United States Court of Appeals
for the Fourth Circuit

UNITED STATES OF AMERICA,
Appellee,

v.

NICO LOWERS,
Appellant.
_____

On Appeal from the United States District Court
for the Eastern District of North Carolina (Myers, J.)
_____

**OPENING BRIEF FOR APPELLANT**
_____

RAYMOND C. TARLTON
TARLTON LAW PLLC
PO Box 91624
Raleigh, NC 27675
(919) 390-1278

*Counsel for Appellant*

April 22, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

JURISDICTIONAL STATEMENT ........................................................... 1

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUE ................................................................. 2

STATEMENT OF THE CASE ................................................................... 3

    A. Facts underlying Lowers's suppression motion ................................ 3

    B. Lowers's Fourth Amendment challenges ........................................ 8

    C. Government response ...................................................................... 9

    D. The District Court's decision and order ......................................... 9

    E. Lowers's conditional plea and sentence ....................................... 10

SUMMARY OF ARGUMENT ................................................................ 11

ARGUMENT ........................................................................................... 13

    I.    The District Court Erred in Failing to Suppress Evidence
           Obtained and Derived from the Detective's Warrantless Search
           of Files from Lowers's Google Drive Cloud Storage
           Account.............. .......................................................... 13

           A. The private search doctrine does not justify the detective's
           warrantless search.............................................................. 14

           B. The fact that their Google Drive account was online does not
           defeat Lowers's reasonable expectation of
           privacy................................................................. 23

C. The detective conducted searches by trespassing upon Lowers's digital 'papers and effects' ................................................................33

D. Neither the good faith nor the attenuation doctrine save the tainted evidence from operation of the exclusionary rule...................................................................36

CONCLUSION...................................................... 46

STATEMENT REGARDING ORAL ARGUMENT .................................47

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES**

*Brown v. Illinois,*
  422 U.S. 590 (1975)..............................................................41

*Byrd v. United States,*
  584 U.S. 395 (2018)..............................................................26

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018)...............................................27, 33, 34

*Coolidge v. New Hampshire,*
  403 U.S. 443 (1971)..............................................................13

*Davis v. United States,*
  564 U.S. 229 (2011)..............................................................38

*Herring v. United States,*
  555 U.S. 135, 145 (2009)........................................................37

*Katz v. United States,*
  389 U.S. 347 (1967)...............................................13, 24, 32, 36

*Kyllo v. United States,*
  533 U.S. 27 (2001).................................................20, 24, 30, 32

*Mapp v. United States,*
  367 U.S. 643 (1961)..........................................................10, 36

*New York v. Harris,*
  495 U.S. 14, 21 (1990)..........................................................45

*Ornelas v. United States,*
  517 U.S. 690 (1996)..............................................................13

*Riley v. California,*
  573 U.S. 373 (2014)..............................................................27

*Smith v. Maryland,*
442 U.S. 735 (1979).) ................................................................24

*Utah v. Strieff,*
136 S. Ct. 2056 (2016) ..............................................................41

*Walter v. United States,*
447 U.S. 649 (1980) ................................................... 17, 20, 22

*Wong Sun v. United States,*
317 U.S. 471, 485 (1963) .....................................................12, 36

*United States v. Ackerman,*
831 F.3d 1292 (10th Cir. 2016) ......................................*passim*

*United States v. Bonds,*
2021 WL 4782270 (W.D.N.C. Oct. 13, 2021) ......................29

*United States v. Clarke,*
842 F.3d 288 (4th Cir. 2016) ..................................................13

*United States v. Chavez,*
423 F. Supp. 3d 194 (W.D.N.C. 2019) ..................................31

*United States v. George,*
975 F.2d 72 (2d Cir. 1992) .......................................................38

*United States v. Hashbarjrami,*
945 F.3d 641 (2d Cir. 2019) ....................................................28

*United States v. Jacobsen,*
466 U.S. 109 (1984) ................................... 15, 21, 24, 38, 40

*United States v. Jones,*
565 U.S. 400 (2012) .............................................................*passim*

*United States v. Jeffrey,*
2024 U.S. App. LEXIS 29787 (4th Cir. Nov. 22, 2024) .......16

*United States v. Knoll,*
    16 F.3d 1313 (2d Cir. 1994) ................................................................. 18

*United States v. Leon,*
    468 U.S. 897 (1984) .......................................................................... 19, 37

*United States v. Maher,*
    120 F.4th 297 (2d Cir. 2024) .............................................. 15, 26, 28, 39

*United States v. Miller,*
    982 F.3d 412 (6th Cir. 2020) ............................................................ 16, 32

*United States v. Nora,*
    765 F.3d 1049 (9th Cir. 2014) ............................................................... 45

*United States v. Ngumezi,*
    980 F.3d 1285 (9th Cir. 2020) ............................................................... 41

*United States v. Place,*
    462 U.S. 696 (1983) ................................................................................ 30

*United States v. Reddick,*
    900 F.3d 636 (5th Cir. 2018) ................................................... 16, 38, 39

*United States v. Ross,*
    456 U.S. 798 (1982) .......................................................................... 16, 32

*United States v. Warshak,*
    631 F.3d 266 (6th Cir. 2010) ................................................................ 28

*United States v. Wilson,*
    13 F.4th 961 (9th Cir. 2021) ........................................................ *passim*

*Weeks v. United States,*
    232 U.S. 383 (1914) .......................................................................... 14, 36

**STATUTES**

18 U.S.C. § 2252 ........................................................................1, 3

18 U.S.C. § 2256 ...........................................................................3

18 U.S.C. § 3231 ............................................................................1

18 U.S.C. § 3742 ............................................................................1

28 U.S.C. § 1291 ............................................................................1

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. IV ..............................................................*passim*

OTHER AUTHORITIES

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.8(b) (6th ed. 2020) ........................................17

Rainey Reitman, *Who Has Your Back? Government Data Requests 2017*, EFF, https://www.eff.org/who-has-your-back-2017 (last visited April 21, 2025) ..........................................................................................29

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the original prosecution under 18 U.S.C. § 3231 and 18 U.S.C. § 2252.  That court entered its final judgment on the docket on October 1, 2024.  JA17, JA 369.  Mr. Lowers filed a timely notice of appeal on October 15, 2024.  JA376.  This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## INTRODUCTION

The issues before this Court concern application of the private search doctrine to automated computer technology created by a private actor, here Google, to ferret out sexually explicit images of minors (CSAM) from its platform. Google's proprietary technology uses hash values, or digital fingerprints, to scan files that come onto its platform through users of Google's products, including those who create password-protected accounts, like Gmail (email) and Google Drive (cloud server for file storage). The hash values are stored in a repository without the actual material that was the source of the original hash value. If a file uploaded to Google's platform shares a hash value from the repository, the automated computer technology will alert, and Google forwards the file to authorities as required by federal statute.

1

Google either relies on the hash value alone or opens the file to confirm the automated assessment before forwarding the file. Here, Google forwarded Lowers's closed files (from their password-protected Google Drive account) to law enforcement after its automated computer assessment alerted to their file. Of the 156 files forwarded to law enforcement, no human employee at Google confirmed the contents of 125 files. Upon receipt of the files and without obtaining a warrant, law enforcement opened (apparently) 3 closed files that the group of files that were not confirmed by any human employee at Google. Once opened, law enforcement was able to observe images consistent with child pornography. Law enforcement put detailed descriptions into search warrant applications that were issued to Google, for Lowers's parents' home in Virginia, and for Lowers's apartment in North Carolina. That evidence was used to prosecute Lowers on the instant offenses.

## STATEMENT OF THE ISSUE

I.  Whether the district court erred in failing to suppress evidence obtained and derived from the detective's warrantless search of files from Lowers's Google Drive cloud storage account.

2

## STATEMENT OF THE CASE

In July 2022, Mr. Lowers, who 23 years old at the time with no prior record, was charged in an indictment with transporting and possessing child pornography, committed between June 27, 2020 and December 8, 2020 (when they were 21 years old), in violation of 18 U.S.C. § 2252. JA20-JA21, JA379, JA385.

### A. Facts underlying Lowers's suppression motion.

On September 23, 2019, Google sent the National Center for Missing and Exploited Children (NCMEC) a CyberTip report of "Apparent Child Pornography" that had been uploaded to a Google Drive cloud storage account (tied to a Google Gmail account harvardoperstein@gmail.com) On September 20, 2019 . JA93, JA96. For most of the files, Google's determination that the file was apparent child pornography was based on a "Hash Match." JA96-JA129, JA142. Google uses "proprietary hashing technology" to identify material that meets the statutory definition of child pornography set forth in 18 U.S.C. § 2256. JA140. Google trains certain employees (Google Reviewers) on the statutory reporting requirements, the statutory definition of child pornography, and how to recognize this material on

3

Google's products and services. JA140. The hash value is entered in "Google's repository of hashes" of apparent child pornography. JA140. When a user of Google's products uploads material to any of Google's services, it will be flagged by Google's computers if the material has a hash value that matches a hash value stored in Google's repository. JA140-JA141. When there is a hash match, Google forwards the file to NCMEC through a CyberTipline in accordance with the reporting requirement. JA140-JA141. Before sending the file to NCMEC, a Google Reviewer will either rely on the hash match or may also decide to view the image that generated a hash match to confirm its contents. JA140-JA141.

In this case, of the 156 images from files submitted by Google from Lowers's Google Drive cloud storage account to NCMEC, a human Google employee apparently viewed 31 of them prior to generating the CyberTip report. JA239. The remaining 125 images from files submitted by Google were flagged as apparent child pornography through Google's proprietary hash value matching software. JA239.

Based on the IP address for the internet service provider account tied to the Google Drive account at issue, NCMEC forwarded the CyberTip report to a detective in Chesapeake, Virginia. JA241.

The detective in Virginia opened several files and viewed, according to their police report, 3 images that were not part of the 31 files that had been reviewed by a human employee at Google but instead—comparing the hash values for those 3 files to the hash values for all 156 files in the CyberTip report—were files that had only been flagged by Google's hash matching software. JA75, JA146.

Sometime afterwards, the detective in Virginia obtained a search warrant on May 27, 2020 issued to Google for, inter alia, the files contained in Lowers's Google accounts, including their Google Drive storage account, an included a reference in their probable cause submission to a detailed description of one image from a file they opened (without a warrant) but did not reference in that submission when the detective had opened the file, whether a human employee at Google had reviewed that file, or whether Google's hash matching software had flagged it. JA199.

On October 8, 2020, the detective obtained a search warrant for Lowers parents' home in Virginia. JA200. That search warrant relied on the fact, in the detective's probable cause submission, that the detective had obtained a series of images from Google pursuant to the May 27, 2020 search warrant. JA204.  The detective in their submission gave detailed descriptions of 3 images from files obtained under the May 27, 2020 search warrant issued to Google. JA210.

On November 24, 2020, after searching his parents' house the previous month, law enforcement went to Lowers's apartment in Raleigh, North Carolina (in the Eastern District of North Carolina), questioned him about downloading child porn while he was at his parents' house in Virginia, JA222, and obtained his purported consent to search two devices, an HP laptop and a Samsung Galaxy 8 cell phone. JA211.

On December 8, 2020, law enforcement in in North Carolina obtained a search warrant for Lowers's apartment in Raleigh. JA212. In the probable cause submission for that search warrant, law enforcement relied on the fact that they had obtained pornographic images from Google pursuant to the May 27, 2020 search warrant. JA221. Law

enforcement also articulated detailed descriptions of three images from files from Lowers's Google Drive account, and law enforcement in North Carolina claimed in this probable cause submission that these three images were from files opened by the detective in Virginia (prior to obtaining any search warrant). JA220. In this submission, law enforcement in North Carolina also relied on the fact that the detective in Virginia obtained a search warrant for Lowers parents' home in Virginia. JA222.

During the December 8, 2020 search of Lowers's apartment (where law enforcement was also simultaneously interviewing Mr. Lowers's again, this time at the police station where he apparently admitted to downloading child porn onto a flash drive in Virginia and traveling to North Carolina with it), law enforcement discovered an external hard drive and a flash drive containing child pornography. JA243-JA244. The evidence obtained through all these searches was used to charge Mr. Lowers with the instant offenses.

## B. Lowers's Fourth Amendment challenges.

Lowers's moved to suppress all evidence obtained through the warrantless search of the closed files provided to law enforcement from Google, a description of which was included in the applications for two search warrants that were issued for Lowers's Google accounts and residence. JA73-JA90. Lowers argued the Government has the burden to prove that a warrantless search meets a narrow and well-defined exception, that they had an expectation of privacy in their password-protected Google Drive, that the warrantless search invaded both their reasonable expectation of privacy and also constituted a trespass-based search, citing primarily to *United States v. Wilson*, 13 F.4 961 (9th Cir. 2021): that the detective in Virginia's warrantless opening and viewing of images from files taken from Lower's Google Drive, but not reviewed by any human employee at Google, exceeded the scope of the private search doctrine, that the good-faith exception to the exclusionary rule should not apply, and that all of the evidence, direct and derivative, should be suppressed under the fruit of the poisonous tree exclusionary rule doctrine. JA73-JA90.

**C. Government response.**

The Government argued that the private search exception applied and the detective in Virginia who opened the files from Google did not expand the scope of Google's private search because the hash value match, in its view, revealed the files' content as child pornography. JA168-JA190. The Government argued that even if the detective's viewing of the files violated Lowers's Fourth Amendment rights, the exclusionary rule should not be applied to suppress the tainted evidence because law enforcement acted in good faith and because of the attenuation doctrine. JA168-JA190.

**D. The District Court's Decision and Order.**

At the district court's request, after Lowers's had moved for suppression, the Government had responded, and Lowers's had filed a reply (including against the Government's invocation of the attenuation doctrine), the Government filed a notice on January 16, 2024 that it did not "believe a [evidentiary] hearing is necessary." JA234. That Government articulated that it believed the suppression issue "is a matter of law" not requiring a hearing. JA234. That same day, Lowers's filed a notice articulating that "a hearing is not required for this motion.

Should this [c]ourt deem that there is a divergence as to the material facts alleged, Mr. [Lowers] would not object to a hearing." JA236.

On February 5, 2024, the district court issued its order denying Lowers's motion to suppress evidence by fully adopting the Government's arguments in opposition to Lowers's motion to suppress evidence. JA238-JA262.

**E. Lowers's conditional plea and sentence.**

On March 27, 2024, Mr. Lowers's entered a conditional plea of guilty to the two-count Indictment, preserving their right to appeal the district court's denial of their suppression motion. JA263-JA303, JA305.

On September 25, 2024, the district court sentenced Lowers's to 96-months' imprisonment. JA357. The court sentenced him to 20 years of supervised release after release from prison. JA358. The court also imposed $27,000 in restitution. JA374.

This timely appeal followed.  JA376.

## SUMMARY OF ARGUMENT

This appeal arises from the district court's erroneous application of the private search doctrine to excuse law enforcement's warrantless search of Mr. Lowers's files from their Google Drive storage account that had not been opened by a human at Google before law enforcement's search. Critical evidence obtained through the warrantless search was included in the search warrant application that issued for Lowers's Google accounts and key statements from that initial application, as well as the fact of evidence obtained from that initial search warrant, was repeated in the warrant application for Lowers's residence, where evidence was obtained to prosecute Lowers's on the instant offenses.

In addition to erroneously ruling that Lowers's lacked a reasonable expectation of privacy in their Google Drive storage account (and rejecting his *Jones*-style trespass argument as to law enforcement's intrusion into their Google Drive account), the district court reached its result through broad application of the private search doctrine which was intended to be applied narrowly. As originally conceived, the private search doctrine allowed

law enforcement to merely repeat a private search and to see the exact same thing the private actor saw. But that is not the case here, because a hash value, consisting of a string of random numbers and letters, does not reveal the same thing as an actual image depicting the graphic and disturbing reality of child pornography. Furthermore, there is too much ambiguity behind Google's hash value technology to equate a hash value match from the past, related to a different file, with an actual image of child pornography in the present file. This is because the hash value was created in the past by an unidentified employee of a private actor at an unknown date and time, about a *different* file that was not retained by the private actor. Consequently, law enforcement could not establish probable cause for issuance of the warrants through the hash value alone because it is not specific to Lowers's Google Drive files.

The evidence required suppression because the law enforcement officers involved did not act in good faith under the *Leon* line of precedents. Additionally, given the purpose and governing factors of the attenuation doctrine as another exception to the exclusionary rule, the district court's erroneous application of it here, where there was never a sufficient break in the causal chain between the warrantless viewing of

unopened files and the series of cascading search warrants in this case, does not save the tainted evidence.

This Court should vacate the district court's suppression order.

## ARGUMENT

When reviewing the denial of a motion to suppress, this Court examines the district court's findings of facts for clear error, while applying de novo review to questions of law and mixed questions of law and fact. *Ornelas v. United States*, 517 U.S. 690, 696, 699 (1996); *United States v. Clarke*, 842 F.3d 288, 293 (4th Cir. 2016).

### I. The District Court Erred in Failing to Suppress Evidence Obtained and Derived from the Detective's Warrantless Search of Files from Lowers's Google Drive Cloud Storage Account.

Warrantless searches are "per se unreasonable under the Fourth Amendment-subject to only a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The burden of proof is on the Government to establish that a search falls within a well-established exception to the warrant requirement. *See Coolidge v. New Hampshire*, 403 U.S. 443, 454- 55 (1971).

13

## A. The private search doctrine does not justify the detective's warrantless search.

The district court erroneously applied the narrow private search exception to the Fourth Amendment's warrant requirement when it ruled that the detective's warrantless review of files from Mr. Lowers's password-protected Google Drive cloud storage account did not constitute an unlawful search.[1] Law enforcement opened Mr. Lowers's files from his account after a private actor, Google, forwarded the files to authorities because its automated hashing technology alerted that the file contained suspected child pornography. No person at Google opened the files that the detective reviewed prior to the forward. Because no private search of the files (relied on by the detective to later obtain a warrant) occurred before the detective opened them, application of the private search doctrine exception was erroneous. Without a valid exception to the warrant requirement present, the district court was wrong to deny Mr. Lowers's suppression motion.

---

[1] The district court also ruled, as a threshold matter, that Mr. Lowers's did not have a reasonable expectation of privacy in the files, which were taken from his password-protected Google Drive cloud storage account and reviewed without a warrant by the detective. That ruling was also erroneous and is addressed below.

14

The private search exception is grounded in the principle that the Fourth Amendment does not apply "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official." *United States v. Jacobsen*, 466 U.S. 109, 113-14 (1984) (citations omitted). Under this doctrine, "the Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. In such a case the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a warrant." *Id.*, at 117-118. That is what happened here.

Lowers's arguments on appeal are grounded in the Ninth Circuit's decision in *United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021), where the Court found, under the same factual circumstances as here, that the government's warrantless search occurred in violation of the Fourth Amendment. [2] The Second Circuit in *United States v. Maher* agrees. 120 F.4th 297 (2d Cir. 2024). The Fifth and Sixth Circuits disagree. *See United*

---

[2] "The events giving rise to Luke Wilson's conviction and this appeal were triggered when Google, as required by federal law, reported to

*States v. Reddick*, 900 F.3d 636 (5th Cir. 2018); *United States v. Miller*, 982 F.3d 412 (6th Cir. 2020).

This Court has not considered application of the private search doctrine in this context where an electronic service provider's proprietary algorithms scan, but no human at the company (like Google) views, the files from a subscriber's account that are then turned over to law enforcement, viewed, and described in detail antecedent to obtaining a warrant. *Cf. United States v. Jeffrey*, No. 23-4264, 2024 U.S. App. LEXIS 29787, *8-11 (4th Cir. Nov. 22, 2024) (unpublished) (determining the district court did not clearly err in its factual finding that a human employee at Microsoft viewed the images utilized in the defendant's internet browser search

---

[NCMEC] that Wilson had uploaded four images of apparent child pornography to his email account as email attachments. No one at Google had opened or viewed Wilson's email attachments; its report was based on an automated assessment that the images Wilson uploaded were the same as images other Google employees had earlier viewed and classified as child pornography. Someone at NCMEC then, also without opening or viewing them, sent Wilson's email attachments to [law enforcement], where an officer ultimately viewed the email attachments without a warrant. The officer then applied for warrants to search both Wilson's email account and Wilson's home, describing the attachments in detail in the application." *Wilson*, 13 F.4th at 964.

engine queries such that law enforcement doing the same did not expand the scope of the private search).

In reaching its decision, *Wilson,* relying on the two Supreme Court cases that formalized the private search doctrine, *Jacobsen* and *Walter v. United States*, 447 U.S. 649 (1980), found that the government's warrantless search, like the one here, exceeded the scope of the antecedent private search. *Wilson*, 13 F.4th at 967-973. From the beginning, the exception was described as "'unsettling' for its potential reach" making it a "subject of concern" and was meant to be "a narrow doctrine with limited applications." *Id.*, at 968 (citing 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.8(b) (6th ed. 2020)). Given these important concerns, Wilson refused to apply the exception for two reasons. First, law enforcement's opening of the email attachments "allowed the government to learn new, critical information that it used first to obtain a warrant and then to prosecute *Wilson*." *Id.*, at 971-972. Second, law enforcement looked at the attachments "even though no Google employee— or other person—had done so, thereby exceeding any earlier privacy intrusion." *Id.* The government's reliance on Google's hash values could not survive the fact that Fourth Amendment rights are personal, and a

computer-generated hash value alert associated with some other file associated with an unidentified user of Google's services had nothing to do with Wilson's files. *Id.*, at 972, 974-975. The same is true here.

Reliability of this process cannot be tested because nothing in the record suggests that Google stores the actual images, but only maintains a repository of hash values. The same was true in *Wilson*. *Wilson*, 13 F.4th at 965 ("As far as the record shows, Google 'stores only the hash values' of images identified as apparent child pornography, not the actual images. The government does not represent otherwise.").

When the detective received the CyberTipline Report with the file from Google all they could see was a closed file named with a random string of numbers and letters: i.e. a hash value. This was a circumstance like the one identified by the Second Circuit in *United States v. Knoll*, because the file was closed, and its content was not apparent from the exterior when the detective received the file from Google. 16 F.3d 1313, 1320-21 (2d Cir. 1994) (defendant's reasonable expectation of privacy in his files continued after they were stolen from his lawyer's office "[s]o long as the opaque file folders were closed or were in closed boxes, and did not reveal their contents, then a reasonable expectation of privacy continued

even after they were stolen from [lawyer's] office."). As such, Lowers's

reasonable expectation of privacy in his closed file—the email

attachment—continued because no private actor searched the file before it

encountered law enforcement. *Id*. Had Google opened the file, Lowers's

"expectation of privacy would have been frustrated and at an end." *Id*.

If the detective had immediately applied for a search warrant at that point

in the investigation, they could only describe the file as a string of letters

and numbers. When the detective opened the file, they were able to tell the

magistrate that the file contained the graphic details that made the

image(s) constitute child pornography. No such details could have been

provided to the magistrate until they opened the file(s) and looked at the

image(s). Consequently, the detective exceeded the scope of Google's hash

value match.

    The district court's reliance on Google's hash value technology to cure

the constitutional violation was error for the following reasons. First, the

hash value match could not fully frustrate Lowers's reasonable expectation

of privacy, because it tells us nothing about Lowers's specific files from

their Google Drive storage account. Again, because Lowers's Fourth

Amendment rights are personal, what may have been inside a different

user's file cannot be used to determine what may have been inside Lowers's file. Second, the record is ambiguous about the reliability of Google's hashing technology. As pointed out in *Wilson*, there are multiple gaps in the record because the government's proof rested on a private company's proprietary computer technology that operates through data entered in the past by people we know nothing about who were trained by people we know nothing about with training materials we know nothing about. *Wilson*, 13 F.4th at 977. Like *Wilson*, no person from Google could tell the district court that the images the detective viewed was identical to the image previously viewed by a Google employee. *Id*. The district court did not even consider the human factor—the Google Reviewer could get it wrong— risking the possibility of searches exposing new and protected information. *See United States v. Ackerman*, 831 F.3d 1292, 1306 (10th Cir. 2016).

The district court's determination that the detective did not exceed the scope of Google's hash value match because of their view of a string of random numbers and letters was not different from their view of actual images depicting the graphic nature of what constitutes child pornography worked to broaden the private search doctrine beyond the limits proscribed by *Walter* and *Jacobsen*. *Walter* concerned a package of obscene films

20

misdelivered to a person who turned them over to law enforcement. *Walter*, 447 U.S. at 651. Before turning the package over to law enforcement, the individual did not view any of the films but observed "suggestive drawings" and read "explicit descriptions of the contents" of the films on the boxes containing individual films. *Id*., at 651-652. When law enforcement received the package from the private party they were in the same position as the private actor—they too could not see the content of the films. *Id*. Without obtaining a warrant, law enforcement watched one of the films to determine whether the rightful owner had committed a federal offense. *Id*. The content of the films was the necessary evidence to secure a conviction at trial and was obtained in violation of the Fourth Amendment. *Id*., at 654. Less was in plain view here because the "labels" affixed to Lowers's files from their Google Drive cloud storage account are a string of random numbers and letters that have no apparent meaning. Similarly, in *Jacobsen*, law enforcement came into possession of a partially opened package from a private actor, Federal Express (FedEx). *Jacobsen*, 466 U.S. at 111. The FedEx employees were handling a damaged package when they opened it and opened another package within where they observed white powder contained in multiple clear Ziplock bags. *Id*. FedEx employees put

21

everything back together and turned it over to law enforcement who took it apart in the same way as the employees had done but went further and opened each of the bags to remove a trace amount of white powder for a chemical field test to determine whether the powder was cocaine. *Id*., at 111-112. The Supreme Court, following *Walter*, held that law enforcement did exceed the scope of the antecedent private search by performing a chemical field test on the white powder, but that was not unlawful under the Fourth Amendment because the field test could only disclose one fact previously unknown to law enforcement—whether the white powder was cocaine. *Id*., at 122. Law enforcement could learn nothing more through the field test, "not even whether the substance was sugar or talcum powder" if the test came back negative. *Id*. Essentially, the chemical field test could reveal "no other arguably 'private' fact" about its owner. *Id*., at 123. The same is not true here.

First, nothing about Lowers's files from their Google Drive cloud storage account was in law enforcement's plain view, and second, if Google's hash value match was wrong, law enforcement's opening of Lowers's files from their Google Drive had the potential to reveal any number of private, and non-illicit facts about Lowers. *See Ackerman*, 831

22

F.3d at 1306 (citations omitted) ("Indeed, when NCMEC opened Mr. Ackerman's email it could have learned any number of private and protected facts, for [ ] no one before us disputes that an email is a virtual container, capable of storing all sorts of private and personal details, from correspondence to other private (and perfectly legal) images, video or audio files, and beyond.").

For these reasons, the district court's application of the private search exception fails, because the detective saw more from their search than Google's hash value match revealed about the file. Consequently, law enforcement exceeded the scope of the private search, and all evidence obtained and derived from the detective's warrantless search required suppression.

## B. The fact that their Google Drive account was online does not defeat Lowers's reasonable expectation of privacy

The district court, in error, also concluded, as a threshold matter, that Mr. Lowers's lacked a reasonable expectation of privacy in the files from their password-protected Google Drive cloud file storage account opened by the detective, because of Google's terms of service and because the files contained contraband.

23

The Fourth Amendment's protections are implicated whenever there is a "search" within the meaning of the Fourth Amendment. *Jacobsen*, 466 U.S. at 113. A search for these purposes occurs when the government intrudes or trespasses upon a constitutionally protected area, including "persons, houses, papers, [or] effects" . . . "for the purpose of obtaining information." *United States v. Jones*, 565 U.S. 400, 404 (2012); *see also Katz v. United States*, 389 U.S. 347, 351 (1967) (setting out the test for areas or spaces in which people have a reasonable expectation of privacy); *Kyllo v. United States*, 533 U.S. 27, 33 (2001). In addition, a Fourth Amendment "search" occurs when a government agent infringes on "an expectation of privacy that society is prepared to consider reasonable[.]" *Jacobsen*, 466 U.S. at 113; *see also Jones*, 565 U.S. at 409 (The "reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."). This non-trespass version of the test for what constitutes a Fourth Amendment "search" is two-fold: (1) the person must have a subjective expectation of privacy in the item or space searched; and (2) that subjective expectation of privacy must be objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

Here, Lowers's asserted below that they had a password-protected Google Drive online file storage account, which was tied to their Google Gmail email account. Nothing in the record suggests that anyone else had that Google account password and could access that account. That fact alone demonstrated his subjective expectation of privacy. The district court's reliance on Google's boiler plate terms of service to conclude that there was no "search" because Lowers's, in its view, those terms defeated Lowers's expectation of privacy in their Google Drive account is wrong and forces an unfair choice of a trade-off between living in the modern world and retaining Fourth Amendment protections. The district court's conclusion that Lowers's lacked an expectation of privacy was also squarely at odds with a recent decision by the Second Circuit that analyzed the very same Google terms of serve relied on by the district court here (and in the same context of hash value matching to scan for apparently illicit images in Google accounts) and determined that Google's terms of service do not defeat an account user's expectation of privacy, especially as the terms repeatedly use the qualifier "may" in discussing the content review done by Google such that the terms are by no means a *per se* signal to Google users that they can have no expectation of privacy in their account contents—

even against the Government. *See Maher*, 120 F.4th at 302, 307-09 (citing *Byrd v. United States*, 584 U.S. 395, 405-07 (2018)) (recognizing the Supreme Court's instructive proposition that the long list of restrictions in a car rental agreement still do not defeat an otherwise lawful user's expectation of privacy in the car even if they are not authorized to drive it). Like the defendant in *Maher*, here, Lowers's expectation was reasonable and in line with the momentum of the law set out, not just in various circuits, but also in several Supreme Court decisions.

In our digital age of being able to communicate and access documents through portable electronic devices (like smartphones) from anywhere we have internet (like WiFi) or cellular connectivity, a convivence that allows people to do their jobs or manage even sensitive parts of their lives from anywhere, the fact that people utilize cloud-based email and storage accounts on severs or platforms owned and operated by third parties like Google and Microsoft does not mean that a majority of people in our society are giving up their privacy expectations just to live in our modern world. The Supreme Court has recognized privacy rights are retained in digital information stored on third-party servers.

In *Riley v. California*, 573 U.S. 373, 397 (2014), the Supreme Court held that the search incident to an arrest exception to the warrant requirement did not cover a warrantless search of the contents of a cell phone given the profound privacy interests in modern communications and file storage or access inherent in cell phone capabilities, as those phones now function like mini-computers. *Id*. at 397 (observing that heightened privacy interests in cell phones exist due to their ability to access cloud computing and display data stored on remote servers and that it makes "little difference" whether that data is stored on the phone itself or on remote servers). Several years later, in *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018), the Court refused to extend the third-party doctrine to the Government's claim that a cell phone user lacks a reasonable expectation of privacy in device vicinity location records stored by third-party cell phone providers. "The third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another. But the fact of 'diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.'" *Id*. (quoting *Riley*, 573 U.S. at 392); *See also Jones*, 565 U.S. at 417 (2012) (Sotomayor, J., concurring) (explaining that the

third-party doctrine "is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks").

Embracing the extension of Fourth Amendment privacy rights into the digital age, several circuits have found that people have a reasonable expectation of privacy in the contents of their email. *See, e.g., Ackerman*, 831 F.3d at 1308 (holding that when the government views email attachments it is a "search" for Fourth Amendment purposes under both an expectation-of-privacy and a trespass-to-chattels theory); *Maher*, 120 F.4th at 307-09 (Google Gmail account email attachment); *United States v. Hashbarjrami*, 945 F.3d 641, 666 (2d Cir. 2019); *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (A person has a "reasonable expectation of privacy in the contents of his emails 'that are stored with, or sent or received through, a commercial ISP.'").[3] In fact, since the Sixth Circuit held

---

[3] At least one district court in North Carolina, analyzing a Fourth Amendment challenge to the same type of hash value searching of a Google Drive account, like here, while denying suppression since, unlike here, a human Google employee viewed the sole file that was later viewed by law enforcement in order to obtain the search warrant (and alternatively, like here, ruling that the *Leon* good-faith doctrine applies), asserted that "[i]t is well-settled that the Fourth Amendment protected extends to a person's electronically stored files, data, e-mail

in *Warshak* that Fourth Amendment protections extended to emails stored on third-party servers, all the major electronic service providers started requiring a warrant before turning over the contents of their users' accounts to the Government in the face of a Government demand.[4]

Cloud server document storage accounts, like Google Drive (here) and Microsoft OneDrive (through the popular Office 365 cloud suite of online software) fit like a hand in a glove with cloud server email accounts, like Google Gmail (implicated here) and Microsoft Outlook, enabling the account users, inter-alia, to quickly attach files to emails and to save attachments from emails into a folder structure.

This approach by the Supreme Court and circuit courts to recognize privacy rights in the online digital information space makes sense. Electronic communications and electronic file storage can reveal and great deal of intimate details about one's life. The fact that the intrusion here into password-protected cloud server accounts is effectuated using scanning

---

attachments, and the like." *United States v. Bonds*, No. 5:21-cr-43, 2021 WL 4782270, at \*5 (W.D.N.C. Oct. 13, 2021) (citing *Kyllo*, 533 U.S. at 33).

[4] *See* Rainey Reitman, *Who Has Your Back? Government Data Requests 2017*, EFF, https://www.eff.org/who-has-your-back-2017 (last visited April 21, 2025).

technology does not defeat that expectation. While K-9 dog sniffs of, say luggage or the outside of a car, are deemed to not be enough of an intrusion into privacy to implicate the Fourth Amendment, *United States v. Place*, 462 U.S. 696, 706-07 (1983), more intrusive remote scanning technology certainly offends the Fourth Amendment, and constitutes an unlawful search, absent probable cause a suspect is committing a crime. *See Kyllo*, 533 U.S. at 38 (thermal imaging detecting heat emanating from inside a home can show more than just illegal activity and can also reveal things like the bathing activities of someone inside). The searching of hash values of digital files stored online and shielded within an account outside of public view is more akin to thermal imaging than they are to dog sniffs. Accordingly, looking inside at the contents of an cloud server online storage account, like Google Drive, even with the use of scanning for hash values inside the account, constitutes as search under the *Katz* reasonable-expectation-of-privacy theory.

Contrary to the district court's reasoning below, the boiler plate terms of service for the Google Drive account at issue, ubiquitous in every electronic service provider cloud platform (email, file storage, social media,

etc), do not defeat Lowers's reasonable expectation of privacy in his Google Drive account.

Similar email accounts, courts have also found a reasonable expectation of privacy in the non-public contents of social media accounts. For example, in *United States v. Chavez*, the district court held that an individual has a "subjective expectation of privacy in his non- public Facebook content that society is prepared to recognize as reasonable. As such, Defendant's legitimate expectation of privacy is protected by the Fourth Amendment." 423 F. Supp. 3d 194, 20 (W.D.N.C. 2019). In so holding, the court compared social media to other "more traditional forms of communication" like mailed letters and phone calls, and reasoned that private social media accounts are due similar Fourth Amendment protection. "As with sealed packages and private phone calls, it is objectively reasonable for an individual to expect privacy in non-public content that is entrusted to a social media website as the intermediary of the ultimate recipient." *Id*. at 203.

Given the trajectory of the case law that people indeed have a reasonable expectation of privacy in certain information shared with third parties that provide the backbone of utilizing mobile communication and

data storage devices, like cell phones, tablets, and laptops, Mr. Lowers had a reasonable expectation of privacy in the contents of his password-protected Google Drive cloud storage account. People use these types of password-protected cloud accounts as the equivalents of papers locked up within a cabinet or safe inside a home or office, which was at the core of the Fourth Amendment's protections as intended by the Framers.

Finally, the district court's determination that there was also no expectation of privacy because the files opened and viewed by the detective contained contraband is also flawed. As the Supreme Court has pointed out there is no distinction between purportedly "worthy" and "unworthy" "containers", because "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822-23 (1982). Mr. Lowers's did have an expectation of privacy in the files in his Google Drive account. *See Wilson*, 13 F.4th at 967 (citing *Kyllo v. United States*, 533 U.S. 27, 33 (2001)); *see also Katz v. United States*, 389 U.S. 347, 361 (1967); *Ackerman*, 831 F.3d at 1308; *Miller*, 982 F.3d at 427.

## C. The detective conducted searches by trespassing upon Lowers's digital 'papers and effects'.

The warrantless viewing of files obtained from Lowers's Google Drive account was a search based also on the *Jones* style trespass or intrusion doctrine. The property-based approach under the Fourth Amendment does not consider the reasonableness of a person's expectations. *See Carpenter*, 138 S. Ct. at 2267-68 (Gorsuch, J., dissenting). Therefore, the third-party doctrine's notion of a disruption of that expectation does not apply. *See id.* For the same reason, the private search doctrine would not apply in a trespass analysis. Rather, the only relevant question is whether a "paper or effect was yours under law. No more [is] needed to trigger the Fourth Amendment." *Id.* at 2268. The contents of Mr. Lowers's Google Drive cloud storage account constituted their papers and effects. For this additional reason, the private search doctrine is inapplicable in this case.

The district court below determined that "[a]pplying a trespass theory to Detective Rider's review of the digital files would seriously strain the

language of the Fourth Amendment and be highly artificial." JA257 (internal citations and quotations omitted). But this is not so.

The second, and older, doctrine for whether a search occurs under the meaning of the Fourth Amendment holds that if the Government intrudes or trespasses on a citizen's person, house, paper, or effects, a search occurs. *Jones*, 565 U.S. at 404. Notably, "many courts have already applied the common law's ancient trespass to chatels doctrine to electronic, not just written, communications." *Ackerman*, 831 F.3d at 1308 (citing cases); *Carpenter v. United States*, 138 S. Ct. 2206, 2269 (2018) (Gorsuch, J. dissenting) ("[F]ew doubt that email should be treated much like the traditional mail it has largely supplanted—as a bailment in which the owner retains a vital and protected legal interest.").

Here, law enforcement reviewed files from a Google Drive cloud storage account without an invitation from the account owner and without a warrant. Social media accounts, online "cloud" systems, email accounts and similar are modern, digital chattel. Like our physical areas that unquestionably enjoy Fourth Amendment protection from government trespass, the government should not be allowed to invade or trespass in analogous virtual areas without a warrant.

34

Courts have applied the Jones trespass theory to the cyber-world.

*Ackerman* held that a government trespass into and onto a citizen's email

was a search under *Jones*: if law enforcement views an email without a

warrant, "that seems pretty clearly to qualify as exactly the type of

trespass to chattels that the framers sought to prevent when they adopted

the Fourth Amendment." *Id.* at 1307. (emphasis added). The court

continued:

> Of course, the framers were concerned with the protection of physical
> rather than virtual correspondence. But a more obvious analogy from
> principle to new technology is hard to imagine and, indeed, many
> courts have already applied the common law's ancient trespass to
> chattels doctrine to electronic, not just written, communications.
> (citing cases).

*Ackerman*, 831 F.3d at 1308. The Government is prohibited from

trespassing without a warrant in virtual areas just as they are prohibited

from warrantless trespass in physical areas.

A Google Drive cloud storage account, like email "is a virtual

container, capable of storing all sorts of private and personal details, from

correspondence to other private (and perfectly legal) images, video or audio

files, and beyond." *Ackerman*, 1306. Just like the government cannot

trespass into a person's physical filing cabinet or safe without a warrant, government agents are not permitted to trespass in analogous online areas.

Here the detective reviewed items from an online file storage account without a warrant. That review was a trespass into that account—into a digital chattel or effect and a search under *Jones*. Lowers's files were not publicly available in that password-protected account. The record shows that the detective was provided with information from that account. The detective opened files culled from private effects, and the detective could not lawfully do so without a search warrant or an invitation from Lowers. The detective's opening of the files was thus a trespass-based "search" under *Jones* just as it was a "search" when analyzed as an expectation of privacy invasion under *Katz*.

### D. Neither the good faith nor the attenuation doctrine save the tainted evidence from operation of the exclusionary rule.

To provide a deterrent safeguard, the Supreme Court has held that, absent some exception, evidence seized in violation of the Fourth Amendment must be suppressed. *Weeks v. United States*, 232 U.S. 383 (1914); *Mapp v. Ohio*, 367 U.S. 643 (1961). The exclusionary rule applies to evidence obtained as both a direct and indirect result of an unlawful

search or seizure. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 485 (1963). All of the evidence used to prosecute Mr. Lowers in this case directly followed from the detective's warrantless opening and viewing of files from Lowers's Google Drive cloud storage account. The exclusionary rule should have led to the suppression of all of the evidence obtained by the cascading search warrants used to seize the evidence against Mr. Lowers.

But the district court erroneously applied the *Leon* good-faith exception to the exclusionary rule as well as the attenuation doctrine, as alternative grounds on which to deny Lowers's suppression motion.

The Supreme Court created an exception to the exclusionary rule when officers conduct a search in good faith reliance upon an objectively reasonable search warrant. *United States v. Leon*, 468 U.S. 897, 925 (1984) (reliance on a facially valid warrant subsequently declared invalid). The good-faith inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n. 23). "The burden is on the government to demonstrate the objective reasonableness

of the officers' good faith reliance . . . ." *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992) (internal citations omitted).

The good-faith exception is inapplicable because no *binding* precedent authorized the search in this case. The good-faith exception sets out that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule". *Davis v. United States*, 564 U.S. 229, 232 (2011). No binding appellate precedent authorized the search in this case. The Supreme Court's acknowledgment of the private search doctrine in *Jacobsen* is not sufficient.

The officers in *Jacobsen* examined a package already opened by private actors. While the officers went beyond the private search by conducting a test to determine whether the white substance inside the packaging was cocaine, the *Jacobsen* held that the test could be conducted without a warrant because a negative finding would reveal nothing private. In stark contrast, a negative search for child pornography in this case would have disclosed a host of private (and perfectly legal) information.[5]

---

[5] While the Fifth Circuit held in 2018 that the private search exception to the warrant requirement applied to a tech provider using proprietary software to determine files contained apparent child porn that were later viewed without a warrant by law enforcement, *Reddick*, 900 F.3d

But more importantly, there was, and is, no binding precedent from this Court holding that opening and visually examining a hashed file without a warrant complied with the Fourth Amendment. A reasonable officer would understand, then, that because the law was unsettled at best, and no binding precedent permitted a warrantless search, it would be reckless or grossly negligent to proceed without one.

Notably, none of the Supreme Court's private search jurisprudence involves an invalidated warrant. Nor does it involve any mistaken belief about the existence of probable cause. Instead, the cases turn entirely on the facts of the private search, as compared to the facts of the subsequent

---

636 (5th Cir. 2018), aside from its misapplication of *Jacobsen*, it is factually distinguishable in that, unlike Google's proprietary hash matching technology and process used here (and in *Wilson* and *Maher*), that case was based on Microsoft's PhotoDNA technology that works in tandem with NCMEC's hash database. *Reddick*, 900 F.3d at 639. Nothing in the record here shows that the detective had a thorough understanding of the workings, reliability, and efficacy of Google's hash value matching technology as compared, say, to Microsoft's technology. *But see Maher*, 120 F.4th at 322 (recognizing that the good-faith exception to the exclusionary rule normally applies in the context of reliance on the issuance of a warrant but also holding that law enforcement reasonably relied on a belief that no warrant was required to view files in the context of Google's hash value matching software leading it to provide law enforcement with files from an account when at the time *Wilson* had not been decided in the Ninth Circuit but *Reddick* had in the Fourth Circuit).

law enforcement search. *See e.g., Jacobsen*, 466 U.S. 109. Depending on the facts, the private search exception either applies and puts the search outside the scope of the Fourth Amendment, or it does not apply, rendering the search illegal. There is no discussion about whether officers reasonably relied on a warrant, because like here, there were none.

The district court also erred in applying the attenuation doctrine to deny Lowers's suppression motion. While evidence obtained from an illegal search may be admissible when "the primary illegality [of] the evidence to which the instant objection is made has [not] been come at by the exploitation of that illegality, [but] instead by means sufficiently distinguishable to be purged of the primary taint". *Wong Sun*, 371 U.S. at 471 (quotation marks and citation omitted), here the evidence used to prosecute Lowers's arose primarily from the detective's detailed descriptions of images from Lowers's Google Drive account files the detective opened without a warrant—provided to law enforcement by Google as unopened files with associated hash value labels by way of NCMEC. The detective, in turn, used those detailed descriptions in their probable cause submission to obtain a search warrant, and those descriptions infected later search warrants. The exploitation of that

40

primary illegality created an unbroken causal chain that resulted in seized

devices containing illicit images in the Eastern District of North Carolina.

The "connection between the unconstitutional police conduct here and the

evidence is [not] remote." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016);

*United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020) (fruit of

poisonous tree doctrine does not require a "particularly tight causal chain

between the illegal search and the discovery of the evidence sought to be

suppressed").

Several factors courts rely on when applying the attenuation doctrine

include, 1) temporal proximity between the illegal action and the

acquisition of the evidence; 2) the presence of intervening circumstances,

and 3) the flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S.

590, 603-04 (1975).

Here, the temporal proximity factor favors Mr. Lowers. The charged

conduct in the indictment spans from June 2020 into December 2020.

JA20-JA21. The cascading series of search warrants, obtained by law

enforcement beginning in May 2020 and ending in December 2020,

repeated, in every warrant, what was seen by the detective in Virginia

during their warrantless opening of files from Lowers's Google Drive

account, including in the final warrant that directly led to additional key evidence being seized to prosecute this case:

- The detective in Virginia, on May 27, 2020, obtained a search warrant for Lowers's issued to Google for information and files from Lowers's Google accounts tied to harvarddeperstein@gmail.com, which include Gmail email and Google Drive accounts. JA 192, 196-97. The detective's probable cause submission contained a somewhat detailed description of one image from the Google Drive file (from an unopened file provided to the detective from Google by way of NCMEC) but did not indicate if it was an image from the file viewed by a human employee at Google or just flagged by the Google's hash matching software before being submitted to NCMEC. JA199. It also did not state when the detective opened the file. JA199.[6]

- On October 8, 2020, the detective obtained a search warrant for Lowers parents' home in Virginia. JA200. That search warrant then

---

[6] While not discussed in the Virginia detective's probable cause submission for the search warrant issued to Google on May 27, 2020, that detective's investigative report indicates that they reviewed three specific images or video clips provided by Google by way of NCMEC after opening those files without a warrant and before they sought the first warrant, the one issued to Google on May 27, 2020. JA146.

relied on the fact, in the probable cause submission, that the detective had obtained a series of images from Google pursuant to the May 27, 2020 search warrant issued to Google. JA204.  The detective offered three detailed descriptions of files from Google obtained pursuant to the May 27, 2020 search warrant issued to Google. JA210.

- On November 24, 2020, after searching his parents' house the previous month, law enforcement went to Lowers's apartment in Raleigh, North Carolina questioned him about downloading child porn while he was at his parents' house in Virginia, JA222, and obtained his purported consent to search two devices, an HP laptop and a Samsung Galaxy 8 cell phone. JA211.

- Approximately 2 weeks later, on December 8, 2020, law enforcement in in North Carolina obtained a search warrant for Lowers's apartment in Raleigh. JA212. In the probable cause submission for that search warrant, law enforcement relied on the fact that they had obtained pornographic images from Google pursuant to the May 27, 2020, search warrant issued to Google. JA221. Law enforcement also articulated, apparently based on their view of what the detective in Virginia looked at from the CyberTip provided to them from Google

and NCMEC, detailed descriptions of three images from files from Lowers's Google Drive account, and law enforcement in North Carolina claimed in this probable cause submission that these three images were from files opened by the detective in Virginia (prior to obtaining any search warrant). JA220. In this submission, law enforcement in North Carolina also relied on the fact that the detective in Virginia obtained a search warrant for Lowers parents' home in Virginia. JA222. The submission also relied on the results of searching the two devices that Lowers's purportedly gave consent to search, which apparently contained at least 4 videos depicting child pornography. JA223.

- The search of Lowers's apartment in Raleigh on December 8, 2020 led to the seizure of evidence that contained child pornography, JA244, and matches the offense date for Count 2 of the Indictment, possession of child pornography. JA20-JA21.

Also, the district court's reasoning that Lowers's purported consent given to law enforcement to search two of his devices on November 8, 2020 was an intervening event that broke the causal chain from the law enforcement conduct offending the Fourth Amendment not only fails to appreciate the

44

cascading nature of the search warrants that repeated the Fourth

Amendment violations in each warrant, the court's reasoning fails to

account for the impact of the unlawfully obtained information in obtaining

the consent. It would defy common sense to think that law enforcement,

prior to obtaining Lowers's purported consent to search, never discussed

with them that they had already viewed an image(s) from his Google Drive

account provided initially by NCMEC and Google, or under the search

warrant issued to Google that relied on the antecedent viewing of an image

from his Google account. *See United States v. Nora*, 765 F.3d 1049, 1057

(9th Cir. 2014) (incriminating statements not an intervening event under

the attenuation doctrine when defendant's answers were likely influenced

by their knowledge that police had already discovered drugs and cash and

that discovery was the product of an unlawful search and seizure). It is also

not at all clear from this record that when the law enforcement went to

interview Lowers on November 8, 2020 (where they apparently obtained

Lowers's consent to search several devices), that they had probable cause to

search his apartment, or even arrest him, when they interviewed him at

the apartment. *Cf. New York v. Harris*, 495 U.S. 14, 21 (1990) (where police

45

have probable cause to arrest but lack a warrant to search the home, a suspect's statement taken at the police station is purged of taint).

Finally, for the same reasons, above, that *Leon* good-faith doctrine should not apply, the flagrancy factor also weighs in favor of not applying the attenuation doctrine to the exclusionary rule. Therefore, this Court should decline to apply the good faith exception and the attenuation doctrine to save the tainted evidence.

## CONCLUSION

Based on these reasons, this Court should vacate the conviction and judgment of the district court and remand with instructions to grant Mr. Lowers's suppression motion.

## STATEMENT REGARDING ORAL ARGUMENT

This case involves important questions about whether the application of the Fourth Amendment privacy principles to the modern era of cloud computing and the remote access our sensitive information stored on cloud servers, thus, Mr. Lowers believes this Court would be assisted by oral argument. He requests oral argument.

Respectfully submitted,

/s/ RAYMOND C. TARLTON
RAYMOND C. TARLTON
TARLTON LAW PLLC
PO Box 91624
Raleigh, NC 27675
(919) 390-1278

47

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,148 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

/S/ RAYMOND C. TARLTON