## No. 24-4546

# United States Court of Appeals for the Fourth Circuit

———————

**UNITED STATES OF AMERICA,**
*Appellee,*

**v.**

**NICO AARON LOWERS,**
*Appellant.*

———————

*On Appeal from the United States District Court
for the Eastern District of North Carolina*

## RESPONSE BRIEF OF THE UNITED STATES

DANIEL P. BUBAR
*Acting United States Attorney*

BY:   DAVID A. BRAGDON
LUCY PARTAIN BROWN
*Assistant United States Attorneys*

150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone:  (919) 856-4530

*Attorneys for Appellee*

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Statement of Jurisdiction ........................................................ 1

Statement of Issues................................................................. 2

Introduction ........................................................................... 3

Statement of Facts.................................................................. 4

Summary of Argument............................................................ 17

Argument ............................................................................... 18

I.    **The district court rightly denied Defendant's motion to suppress because law enforcement did not violate the Fourth Amendment by viewing the files sent by Google/NCMEC.**

      A.    Standard of Review.................................................... 18

      B.    Discussion of Issue. .................................................. 18

            1.    Law enforcement opening Defendant's hash-matched files was not a search under the meaning of the Fourth Amendment.................................. 19

            2.    Even if law enforcement searched Defendant's files, this did not violate the Fourth Amendment because Google had examined the material first, and law enforcement did not exceed the scope of Google's review............................................. 26

II.   **Even if the initial viewing of the images was unlawful, the district court was still right to deny the motion to suppress because law enforcement acted in good faith, and the ultimate evidence was attenuated from any error.**

      A.    Standard of Review.................................................... 31

B.     Discussion of Issue. ................................................................. 32

    1.     Warrantless inspection of the files was consistent with statutory and case law, so law enforcement acted in good faith ............... **Error! Bookmark not defined.**

    2.     The evidence in this case was attenuated from the initial examination by months and intervening events, including multiple consensual encounters ...................................................................... 34

**III. If this Court disagrees with the arguments above, it should remand for an evidentiary hearing.**

A.     Standard of Review.................................................................. 41

B.     Discussion of Issue. ................................................................. 41

Conclusion ................................................................................... 45

Certificate of Compliance

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Brown v. Illinois,*
    422 U.S. (1975) ............................................................................. passim

*Burdeau v. McDowell,*
    256 U.S. 465 ................................................................................25, 26

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971) ....................................................................18, 27

*Davis v. United States,*
    564 U.S. 229 (2011) .............................................................15, 16, 32, 34

*Ex parte Jackson,*
    96 U.S. 727 (1877) ........................................................................ 26

*Herring v. United States,*
    555 U.S. 135 (2009) ...................................................................... 32

*Illinois v. Caballes,*
    543 U.S. 405 (2005) ...................................................................... 14

*Katz v. United States,*
    389 U.S. 347 (1967) ...................................................................... 26

*Nardone v. United States,*
    308 U.S. 338 (1939) ...................................................................... 34

*Nix v. Williams,*
    467 U.S. 431 (1984) ...................................................................... 44

*Smith v. Maryland,*
    442 U.S. 735 (1979) ....................................................................20, 24

*United States v. Clark,*
    935 F.3d 558 (7th Cir. 2019) ......................................................... 42

*United States v. DiCesare*,
   765 F.2d 890 (9th Cir.)..................................................... 42

*United States v. Fall*,
   955 F.3d 363 (4th Cir. 2020)...........................................18, 27

*United States v. Gillenwaters*,
   890 F.2d 679 (4th Cir. 1989)............................................. 44

*United States v. Gray*,
   491 F.3d 138 (4th Cir. 2007)............................................. 20

*United States v. Hooker*,
   54 F.3d 774 (4th Cir. 1995) (unpublished)...........................36, 38

*United States v. Jackson*,
   728 F.3d 367 (4th Cir. 2013)............................................. 19

*United States v. Jacobsen*,
   466 U.S. 109 (1984) ................................................ passim

*United States v. Jeffery*,
   No. 23-4264, 2024 WL 4866686 (4th Cir. 2024)
   (unpublished) ............................................................. 39

*United States v. Jones*,
   565 U.S. 400 (2012) ............................................ 19, 25, 26

*United States v. Maher*,
   120 F.4th 297 (2d Cir. 2024)........................................ passim

*United States v. Mandel*,
   591 F.2d 1347 (4th Cir.), *on reh'g*, 602 F.2d 653
   (4th Cir. 1979) .......................................................... 41

*United States v. Martinez*,
   606 F.3d 1303 (11th Cir. 2010).......................................41–42

*United States v. Miller*,
   982 F.3d 412 (6th Cir. 2020)........................................ passim

*United States v. Morehouse,*
  34 F.4th 381 (4th Cir. 2022) ...................................................... 5

*United States v. Najjar,*
  300 F.3d 466 (4th Cir. 2002) ............................................... 35, 37

*United States v. Pulley,*
  987 F.3d 370 (4th Cir. 2021) ....................................... 18, 29, 31

*United States v. Reddick,*
  900 F.3d 636 (5th Cir. 2018) ........................................ 5, 27, 33

*United States v. Richardson,*
  607 F.3d 357 (4th Cir. 2010) .................................................. 39

*United States v. Sanders,*
  954 F.2d 227 (4th Cir. 1992) ................................................. 42

*United States v. Seidman,*
  156 F.3d 542 (4th Cir. 1998) ............................................. 35, 38

*United States v. Simons,*
  206 F.3d 392 (4th Cir. 2000) ............................................. 20, 22

*United States v. Stephens,*
  764 F.3d 327 (4th Cir. 2014) .................................................. 19

*United States v. Wilson,*
  13 F.4th 961 (9th Cir. 2021) .......................................... passim

*United States v. Wooden,*
  693 F.3d 440 (4th Cir. 2012) ....................................... 18, 29, 31

*United States v. Young,*
  350 F.3d 1302 (11th Cir. 2003) .......................................... 20, 23

*Utah v. Strieff,*
  579 U.S. 232 (2016) ............................................................ 34

*Walter v. United States,*
  447 U.S. 649 (1980) ............................................................ 28

*Wong Sun v. United States*,
  371 U.S. 471 (1963) ........................................................ passim

## Statutes

18 U.S.C. § 2252(a)(1) ............................................................ 4

18 U.S.C. § 2252(a)(4)(b) ........................................................ 4

18 U.S.C. § 2252(b) ................................................................ 4

18 U.S.C. § 2258A(c)(2) .......................................................... 6

18 U.S.C. § 3231 ...................................................................... 1

18 U.S.C. § 3742(a) .................................................................. 1

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 2106 .................................................................... 41

## Rules

Fed. R. Evid. 902 .................................................................... 5

## Other Authorities

5 Am. Jur. 2d Appellate Review § 705 .................................... 41

*A Digital World*,
  119 Harv. L. Rev. F. 531 (2005) ...................................... 5, 12

*Fourth Amendment Search and the Power of the Hash*,
  119 Harv. L. Rev. F. 38 (2005) ............................................ 12

*Hash It Out: Fourth Amendment Protection of Electronically Stored Child Exploitation*, 53 Akron L. Rev. 217 (2019) ................................. 12

https://policies.google.com/privacy/archive/20190122?hl=en-US ......... 21–23

## STATEMENT OF JURISDICTION

Defendant Nico Aaron Lowers appeals from a judgment of conviction following a guilty plea. Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The judgment was entered on October 1, 2024, and Defendant filed a timely notice of appeal on October 15, 2024.

## STATEMENT OF ISSUES

1.     Google warned Defendant that it would scan his account for illegal content, like child pornography. Where it then did, found over 150 child pornography files, and turned them over to law enforcement, (a) did Defendant have a reasonable expectation in his child-pornography images and videos; (b) did law enforcement's opening of the files sent by Google constitute a physical trespass on Defendant's account; and (c) if so, did law enforcement's search exceed the scope of Google's search where Google had confirmed that every image it provided to law enforcement was identical to images previously viewed by Google?

2.     Even if this were a violation, is exclusion appropriate where (a) the detective was acting in good faith because case law at the time approved of opening the files; and (b) the evidence Defendant is seeking to exclude was attenuated because it was gathered months later after many other investigative means, including consensual interviews and other searches?

3.     Alternatively, should this Court remand to the district court to allow it to conduct a hearing and make factual findings?

# INTRODUCTION

The government has four independent arguments as to why the evidence should not be suppressed. Section I, below, has two arguments about the Fourth Amendment and its application to the relevant technology. But the Court need not reach those questions because even if Fourth Amendment error occurred, the district court was still right to deny the motion to suppress.

First, good faith applies because law enforcement actions were consistent with statutory and case law at the time of the search, as the Second Circuit has found in similar circumstances. *United States v. Maher*, 120 F.4th 297, 320–23 (2d Cir. 2024). Second, any law enforcement error was significantly attenuated from the ultimate evidence in this case. For starters, any child pornography files law enforcement viewed without a warrant are *not* the basis for Defendant's charges. Instead, those files led to a search of an online account, which led to a residential search warrant in Virginia, which led to information about Defendant living in North Carolina, which led to a consensual interview with Defendant, which led to a consensual examination of his cell phone, which led to finding "deleted" child pornography, which led to another consensual interview and a residential search warrant, which led to the evidence Defendant seeks to suppress—six or seven months after the supposed error. The claimed error is too attenuated to require suppression.

No error occurred, but the Court may avoid any difficulty in deciding the merits through the government's prudential arguments. They should prevail.

## STATEMENT OF FACTS

### Procedural History

The grand jury indicted Defendant Nico Aaron Lowers on one count of transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1) and (b) (Count One), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(b) (Count Two). J.A. 20–21. Defendant moved to suppress the government's evidence, and the district court denied his motion. J.A. 73, J.A. 238. He then pled guilty to both counts with a plea agreement that preserved his ability to appeal the denial of his motion to suppress. J.A. 304–305. The district court sentenced him to a downward variance sentence of 96 months' imprisonment, and Defendant appealed. J.A. 357, J.A. 376.

### Offense Conduct

On September 23, 2019, Google made a CyberTipline Report ("the Report") to the National Center for Missing and Exploited Children ("NCMEC").[1] J.A. 93. The Report indicated that a Google user with email address "harvardeperstein@gmail.com" had uploaded 156 images of "Apparent Child Pornography" onto a cloud-based Google drive.[2] J.A. 95–96. File names included "daddaughtermasturbate," "BabyJassfucked," "Pedo_-_8Yo_Girl

---

[1]   This summary draws heavily from the district court's order, which was based on agreement by the parties. *See* J.A. 238 n.1. To the extent it also included factual findings, those are given deference and not challenged by Defendant.

[2]   Federal statutes use the term "child pornography," but "[o]utside the legal system," it is commonly referred to—including sometimes by Google—as

_Suck," and "daughterjerksdadcock." J.A. 110–116.

Of those 156 files, a Google employee viewed 31 of them and identified them as child pornography immediately prior to generation and transmission of the Report. J.A. 96–129. The remaining 125 were included in the Report as obvious child pornography because they were hash value matches to material previously identified by Google employees as child pornography.[3] J.A. 95; *see also* J.A. 251.

Having identified the 156 images, Google sent them onto NCMEC, where the same 31 images were viewed again. J.A. 132–33, J.A. 241. Based on the IP address included in the report, and consistent with its own statutory obligations,

---

"child sexual abuse material or CSAM in order to most accurately reflect what is depicted—the sexual abuse and exploitation of children." *United States v. Morehouse,* 34 F.4th 381, 384 n.1 (4th Cir. 2022) (internal quotation marks omitted); *see also* J.A. 140. Because "child pornography" is the statutory term, the government uses it here.

[3]  "A hash value is a number that is often represented as a sequence of characters and is produced by an algorithm based upon the digital contents of a drive, medium, or file." J.A. 239; Fed. R. Evid. 902 advisory committee note to 2017 amendment; *see also United States v. Wilson,* 13 F.4th 961, 964 (9th Cir. 2021); *United States v. Miller,* 982 F.3d 412, 418 (6th Cir. 2020); *United States v. Reddick,* 900 F.3d 636, 637 (5th Cir. 2018) (all discussing Google's hash value system). Because an algorithm that generates hash values produces a unique numerical identifier for each file, a subsequent hash match between two files establishes a virtual certainty that the two files are the same; "[i]f two nonidentical files are inputted into [a] hash program, the computer will output different results." J.A. 239 (quoting Orin S. Kerr, *Searches and Seizures in A Digital World,* 119 Harv. L. Rev. F. 531, 541 (2005)). Google has a proprietary hashing system. J.A. 240–241.

NCMEC forwarded the Report to the Bedford County, Virginia Sheriff's Office for further investigation on October 29, 2019. J.A. 145; 18 U.S.C. § 2258A(c)(2).

Several months later, on April 16, 2020, an investigator in that office reviewed the Report. J.A. 144. He then obtained an administrative subpoena, the results of which linked the IP address to a subscriber in Chesapeake, Virginia. J.A. 145. On or about May 13, 2020, the investigator forwarded the Report to the Chesapeake Police Department. J.A. 145.

Shortly thereafter, Detective Jennifer Rider of the Chesapeake Police Department downloaded the Report. J.A. 145. She then viewed at least 3 of the 156 images included in the Report that were not among the 31 viewed by Google and NCMEC before sending. J.A. 145; *see also* Section III, below. On May 27, 2020, Detective Rider applied for a search warrant for the Google account that had originally uploaded the images. J.A. 152. The warrant affidavit noted that the affiant had reviewed the images in the Report. J.A. 155. It also included a description of a different image than the three described in Detective Rider's report. *Compare* J.A. 155 *with* J.A. 146; *see also* J.A. 242, n.2. The warrant return indicated that the Google account was created on September 20, 2019, in the name of Harvard Eperstein. J.A. 146. It was active for less than 30 minutes, during which time the user uploaded the 156 files containing child pornography to the Google drive. J.A. 146, 148. The account was then deleted. J.A. 146, J.A. 148.

The IP address was linked to a residence in Chesapeake owned by Defendant's parents. J.A. 146. Detective Rider conducted surveillance at the

residence from July to September 2020. J.A. 148. Then, in October 2020, Detective Rider sought and obtained a search warrant for it. J.A. 149. The warrant affidavit included descriptions of three files Detective Rider had viewed. J.A. 210.

Law enforcement seized ten devices during execution of the search warrant on October 12, 2020. J.A. 149. No evidence of child pornography was located on any of those devices. J.A. 149. In addition, Defendant's parents were interviewed; they denied knowledge of any child pornography but mentioned that their son, Defendant, had moved out of their house several months before and relocated to Raleigh, North Carolina. J.A. 149. Defendant's parents provided law enforcement with access to his new address and phone number. J.A. 150.

Chesapeake PD then closed their case and forwarded the information they had collected to law enforcement in North Carolina, at which point Defendant became the subject of the investigation. J.A. 150, J.A. 222. Law enforcement in North Carolina arranged for a voluntary interview with Defendant, which took place on November 24, 2020. J.A. 221–223, J.A. 211. He denied knowledge of the Google account or any child pornography. J.A. 222. At the conclusion of the interview, he gave consent to examine his laptop computer and cell phone. J.A. 222–223, J.A. 211.

In the days following that interview, law enforcement analyzed Defendant's devices and found four videos of child pornography on his phone that had previously been deleted. J.A. 223, J.A. 173. They also found "child

erotica" on his laptop and other sexual images in which it was difficult to ascertain the ages of the individuals. J.A. 174.

Law enforcement then arranged for a second interview, which took place on December 8, 2020. J.A. 176. Defendant was reminded that the interview was voluntary and that he could leave at any time. J.A. 176. He continued to deny any knowledge of child pornography. J.A. 176. Law enforcement confronted Defendant with the videos they had recovered from his cell phone. J.A. 176. At that point, Defendant admitted to downloading child pornography onto a flash drive in Virginia and bringing that flash drive with him when he moved to Raleigh. J.A. 176. He told officers that the flash drive was stored in a wooden box in his bedroom. J.A. 176.

Law enforcement had already sought and obtained a search warrant for Defendant's Raleigh apartment before his second interview. J.A. 176, J.A. 212–225. Beyond the material in Detective Rider's original warrant, the probable cause in the warrant affidavit included the first interview with Defendant and the results of the consensual search of his devices. J.A. 222–223. Law enforcement executed that warrant during the interview. J.A. 177. They found the flash drive that Defendant had described. J.A. 177. It contained 264 images and 17 videos of child pornography. J.A. 177. Law enforcement also discovered a hard drive in Defendant's apartment that contained 764 images and 11 videos of child pornography. J.A. 178. This material led to his federal charges. J.A. 20–21.

## Suppression Proceedings in District Court

### Defense Motion to Suppress

Defendant moved to suppress "[a]ll evidence" in the case. J.A. 73. He argued that the government "violated Mr. Lowers' constitutional rights under the Fourth Amendment when, without seeking a warrant, Detective Rider viewed files purportedly associated with Mr. Lowers' private email account." J.A. 77. He claimed a reasonable expectation of privacy in the contents of his Google account. J.A. 78, J.A. 80. He also claimed that law enforcement violated his property interests—effectively trespassing—by viewing the files. J.A. 80–83.

Defendant proactively argued that the "private search doctrine" exception did not apply because "[c]rucially, Detective Rider…viewed three further files" beyond the 31 viewed by employees of Google and NCMEC, basing his argument on the Ninth Circuit's opinion in *United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021). J.A. 85; *see also* Brief at 15. He also claimed that NCMEC was acting as a government agent when it viewed the files. J.A. 87. Finally, Defendant argued that the good faith exception to the exclusionary rule should not apply because there was no "reliance on a valid warrant issued by a magistrate." J.A. 88–89.

Defendant attached several exhibits to his motion. Exhibit A was the NCMEC CyberTipline Report. J.A. 93. It detailed the basic information about each file sent along by Google, including the original file name and, where applicable, whether the file had been viewed and a general classification of its content as containing a pre- or pubescent minor displaying a sex act or lascivious

9

exhibition. J.A. 93–130. Exhibit B was a declaration from a member of Google's Legal Investigations Support team, who explained and linked to Google's Terms of Service and its Privacy Policy, which stated: "[W]e analyze your content to help us detect abuse such as spam, malware, and illegal content." J.A. 139 (linking to Google's Privacy Policy). The declaration also explained Google's hashing technology and "private, non-government interests" in "[r]idding its services" of child pornography. J.A. 140–142. Exhibit C was Detective Rider's report, describing her investigation in this case, including "review[ing]…the images uploaded by the suspect," which she found to be "sexually explicit images and videos depicting pre-pubescent minors engaging in sexual acts" and then describing three examples. J.A. 146. And Exhibit D was Detective Rider's search warrant affidavit, which again explained that she "reviewed the…uploaded image/videos" and "found sexually explicit images and videos involving pre-pubescent minors engaging in sexual acts" and described one example, different from the three in her report. J.A. 155.

## Government Response in Opposition

The government responded in opposition. It argued that Detective Rider did not exceed Google's search because the files she reviewed had already been viewed by Google and determined to contain apparent child pornography, whether immediately preceding the NCMEC report or at a prior occasion. J.A. 180. It noted that hash-matching provided a virtual certainty that Detective Rider's examination would reveal only what Google had already viewed. J.A.

10

180–181. The government also suggested that Defendant abandoned his online account, having used it for only a few minutes and later denying ownership of it. J.A. 182. The government further argued that Detective Rider's warrant had sufficient probable cause even if the district court believed her review of the images constituted an illegal search and excised that from the affidavit. J.A. 183–184. It also argued that the good faith exception applied. J.A. 184–185. Finally, it argued that, even if there were an initial Fourth Amendment violation, it was sufficiently attenuated from the ultimate evidence in its case. J.A. 185–90.

### Defendant's Reply

Defendant replied in support of his motion. He argued that law enforcement got additional information by opening the files and that, even if they were identical to files Google had viewed before, Defendant had a privacy interest in his files. J.A. 227–228. He refuted the suggestion that the warrant had sufficient probable cause without the content of the images and that good faith applied without a warrant. J.A. 228–229. As to attenuation, he implicitly conceded the first factor—temporal distance between the alleged violation and evidence—but briefly refuted the remaining two. J.A. 229–231.

The parties agreed that a hearing was unnecessary and notified the district court accordingly. J.A. 234–237.

### District Court Order

The district court issued a written order denying Defendant's motion to suppress on "[f]ive independent (and independently sufficient) bases." J.A. 248.

11

It described the hashing process generally and as employed by Google, explaining that the company identifies child sex abuse materials by looking at images and hashing them. J.A. 140. It went on: "'Hashing is a powerful and pervasive technique [in which one] take[s] a large amount of data, such as a file ... , and use[s] a complex mathematical algorithm to generate a relatively compact numerical identifier (the hash value) unique to that data.'" J.A. 239 (quoting Richard P. Salgado, *Fourth Amendment Search and the Power of the Hash*, 119 HARV. L. REV. F. 38 (2005)). A subsequent hash match "between two files establishes a virtual certainty that the two files are the same." J.A. 239 (citing Orin S. Kerr, *Searches and Seizures in A Digital World*, 119 HARV. L. REV. F. 531, 546 (2005)) ("If there is a match between the hash of a known file in a database and a file located in [a] computer being searched, an analyst can be confident that he has identified a particular file without actually opening or looking at it."). The chance of two different files sharing the same hash value is "less than one in one billion." J.A. 240 (citing Rebekah A. Branham, *Hash It Out: Fourth Amendment Protection of Electronically Stored Child Exploitation*, 53 AKRON L. REV. 217, 219 (2019).

The Order also explained that Google uses proprietary hashing technology to detect child pornography. If a Google employee trained in identifying child pornography reviews an offending file and concludes that it is child pornography, the file is "given a digital fingerprint," referred to as a hash value. J.A. 140, J.A. 241. Google stores these hash values on an internal system. J.A. 140.

Google then compares the hash values to images later uploaded to Google's systems and services. J.A. 140. If a later-uploaded image contains a hash value that matches the hash value of a previously reviewed image of child pornography, Google reports the later-uploaded image to NCMEC as child pornography. J.A. 140. The later-uploaded image may or may not be visually reviewed by a Google employee. J.A. 141.

As to its legal holdings, first, the district court held that Defendant fell short of his burden of production to demonstrate an objectively reasonable expectation of privacy in his Google account. In so holding, the district court relied on Google's Terms of Service, which inform users that Google may monitor activity to detect illegal content and to which Defendant agreed when he created his Google account. J.A. 249. Defendant's motion "neglect[ed] to grapple with the consequences of that acquiescence." J.A. 249. Without doing so, Defendant did not meet "his burden in demonstrating that any subjective expectation of privacy was objectively reasonable." J.A. 250 (noting explicitly that this decision turned on Defendant's lack of evidence and not a per se rule that individuals lack a reasonable expectation of privacy in an online account).

Second, the district court held that, account aside, Defendant could not maintain a reasonable expectation of privacy in files containing only child pornography. J.A. 250. It emphasized the reliability of Google's hashing technology (and its "1 in 9.2 quintillion" chance that two files share the same has value) and found that that meant when Google turned over 156 files to NCMEC, they were "obvious contraband." J.A. 250–251. And the Fourth Amendment, it reminded

13

Defendant, "does not protect an individual's desire to privately possess contraband." J.A. 252. Therefore, it held, when Detective Rider visually inspected those images, there was no Fourth Amendment violation because "'governmental conduct that only reveals the possession of contraband compromises no legitimate privacy interest,'" and a "hash match to a known image of child pornography represents definitive proof that that matching image is the same image." J.A. 251 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)); J.A. 253. This case differed from Tenth Circuit precedent in which law enforcement opened an email and three attachments that had *not* been hash-matched. J.A. 253. Because it was "virtually impossible" that Detective Rider would view protected non-contraband, the "motion to suppress must be denied." J.A. 254.

Third, the district court held that Detective Rider's review of the images to which Defendant objected did not exceed Google's prior search. Necessarily, Google employees who were trained on the federal definition of child pornography had previously viewed those images and confirmed their illegality. J.A. 254. The hash-matching technology that alerted that Defendant possessed the files was "sufficiently reliable" and "not contested" by Defendant. J.A. 255. So, Detective Rider's viewing of the images "did not exceed Google's search because there was a virtual certainty that she would identify nothing of significance that Google had not already identified." J.A. 255. The district court distinguished the Ninth Circuit case—*United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021)— upon which Defendant relied, pointing out that it misapplied earlier Supreme Court precedent. J.A. 255. The inquiry was not whether viewing the image

14

would provide new information but whether viewing the image would reveal "a noncontraband personal effect in which an individual could have a reasonable expectation of privacy." J.A. 255–256. Because Detective Rider's inspection "could only reveal additional information about an item of contraband" (and because "an individual does not have a reasonable expectation of privacy in contraband"), her visual inspection did not exceed Google's search. J.A. 257.

The district court also refuted Defendant's trespass theory. J.A. 257, n.6. It first noted that there was no physical intrusion. J.A. 257, n.6. It also pointed out that if any entity "trespassed" on Defendant's property, it was Google, not the government. J.A. 257, n.6. Next, the district court addressed Defendant's claim, "not meaningfully develop[ed]," that private search would not apply because NCMEC was a purported government agent. J.A. 257, n.6. To this, the court pointed out that Google employees originally frustrated any expectation of privacy, and their transmission of a Report to NCMEC "cannot be said to have resurrected" it. J.A. 257, n.6.

Fourth, the district court held that even if Detective Rider's search was unlawful, the good faith exception to the exclusionary rule applied. It rejected Defendant's claim that good faith only applied when an officer relied on an issued warrant, quoting Supreme Court case law that said the exception "applies 'across a range of cases.'" J.A. 258 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). It found the exception applied because Detective Rider inspected the images in reasonable reliance on a statute that required NCMEC to make reports of child pornography "***available***" to law enforcement. J.A. 258 (emphasis

in original) (suggesting the Report "could hardly be considered 'available' to law enforcement if Detective Rider could only review its contents after obtaining a search warrant."). This section concluded with the district court's finding that Detective Rider's conduct in this case should not "trigger the harsh sanction of exclusion." J.A. 259 (quoting *Davis*, 564 U.S. at 240).

Fifth and finally, the district court held that the ultimate evidence in Defendant's case was attenuated from Detective Rider's viewing of the material from the Google account. It summarized the events between inspection of the files from Google and Defendant's arrest and noted: "His charges do not arise from evidence uncovered during the search in May 2020." J.A. 259. The court then examined the three factors identified by the Supreme Court in *Brown v. Illinois*, 422 U.S. at 603–04 (1975), when considering attenuation, and found that each one supported a finding of attenuation in this case. J.A. 260–261.

For all these reasons, the district court denied Defendant's motion to suppress the evidence in this case.

### Arraignment and Sentencing

Defendant pled guilty to both counts with a written plea agreement that permitted him to appeal the district court's denial of his motion to suppress. J.A. 263–313. The Presentence Investigation Report calculated his guidelines range to be 121 to 151 months' imprisonment. J.A. 390, ¶ 58. At sentencing, the district court varied downward to a sentence of 96 months. J.A. 357. Defendant appealed. J.A. 376.

# SUMMARY OF ARGUMENT

1.    Law enforcement did not violate Defendant's rights by examining the child pornography files sent by Google/NCMEC. An unlawful search occurs when (1) a government actor (2a) invades a reasonable expectation of privacy or (2b) intrudes on private property. None of those preconditions are present here.

Defendant had no reasonable expectation of privacy because Google warned him it would monitor his account for illegal content like child pornography. And if there was an intrusion on private property in this case, it was done by Google, a private actor, rather than the government. And finally, since Google only provided law enforcement with materials that it was "virtual[ly] certain[]" it had seen before, law enforcement could inspect those materials without consequence. *See United States v. Jacobsen*, 466 U.S. 109, 119 (1984).

2.    Even if Detective Rider's warrantless inspection of the files sent by Google/NCMEC was an unlawful search, it still does not merit suppression. First, she acted in good faith, as both statutory and case law indicated that she was allowed to open the files. And second, the actual evidence in this case was attenuated from her initial inspection through many months and intervening circumstances, including multiple consensual encounters.

3.    Finally, even if the Court is unpersuaded by any of the above, it should remand for additional factual development.

17

# ARGUMENT

## I. The district court rightly denied Defendant's motion to suppress because law enforcement did not violate the Fourth Amendment by viewing the files sent by Google/NCMEC.

### A. Standard of Review.

In reviewing the denial of a motion to suppress, the Court reviews legal conclusions de novo and factual findings for clear error, taking the evidence in the light most favorable to the government. *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021). A court conducting a clear-error review "'may not reverse a lower court's finding of fact simply because [it] would have decided the case differently.'" *Id.* (quoting *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012)). Rather, it "'must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Wooden*, 693 F.3d at 451).

### B. Discussion of Issue.

The Fourth Amendment offers no refuge for defendants who voluntarily provide evidence of their wrongdoing to private third parties—nor does it prevent those third parties from forwarding the evidence to the government. *See United States v. Fall*, 955 F.3d 363, 370 (4th Cir. 2020) ("[T]he Fourth Amendment does not protect against searches conducted by private individuals acting in a private capacity."); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 489 (1971) ("[S]urely when Mrs. Coolidge of her own accord produced the [evidence] for inspection … it was not incumbent on the police to stop her or avert

their eyes."). Defendant uploaded child pornography to an account that warned him it would monitor for child pornography. Having been warned, Defendant had no reasonable expectation of privacy in the child pornography. And when the Google detected, examined, and forwarded the material along to law enforcement, law enforcement could then view the images and videos without violating Defendant's constitutional protections.

**1.    Law enforcement opening Defendant's hash-matched files was not a search under the meaning of the Fourth Amendment.**

    a.    Defendant did not demonstrate a reasonable expectation of privacy in illegal content uploaded to an account which warned him it would be monitored for illegal content.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A search occurs when a government actor invades a reasonable expectation of privacy or intrudes on private property. *See, e.g.*, *United States v. Stephens*, 764 F.3d 327, 331 (4th Cir. 2014); *United States v. Jones*, 565 U.S. 400, 404–408 (2012). For example, when officers encounter evidence available to the public, the Fourth Amendment is not implicated because no search has occurred. *See, e.g.*, *United States v. Jackson*, 728 F.3d 367, 373–74 (4th Cir. 2013) (publicly accessible common areas of apartment complex).

19

In the motion to suppress context, a defendant must demonstrate: (1) a subjective expectation of privacy in the area searched *and* (2) that that expectation is objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). "The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant." *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007).

A legitimate expectation of privacy can be reduced by notice. *See United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000). In *Simons*, the defendant's employer— the Foreign Bureau of Information Services—had a stated policy that it would "audit, inspect, and/or monitor" employee internet use as it deemed appropriate. *Id.* "This policy placed employees on notice that they could not reasonably expect that their internet activity would be private." *Id.* So, when the employer remotely searched and seized child pornography files from the defendant's work computer, he had no Fourth Amendment recourse, as "regardless of whether [the defendant] subjectively believed that the files he transferred from the Internet were private, such a belief was not objectively reasonable after [his employer] notified him that it would be overseeing his Internet use." *Id.*

The defendant in *United States v. Young* shipped a large amount of cash via Federal Express despite notice that "Federal Express may open and inspect packages at any time" and a warning on the envelope reading "'Do not send cash.'" 350 F.3d 1302, 1304–05 (11th Cir. 2003). The Eleventh Circuit held that these warnings "simply eliminate[d] any expectation of privacy," so the warrantless search of the package was lawful, even though it was conducted by government actors. *Id.* at 1307–08.

Here, Google's Privacy Policy warned: "[W]e analyze your content to help us detect abuse such as spam, malware, and illegal content." *See* J.A. 139 (quotation from link in Paragraph 3).[4] It also stated, "Google uses and may disclose information . . . for protecting against other malicious, deceptive, fraudulent, or illegal activity." J.A. 139 (same). The company even explained "we may also report the violation to appropriate authorities" "[w]hen we detect spam, malware, illegal content, and other forms of abuse on our systems in violation of our policies. …" J.A. 139 (same). And Google also bans child pornography specifically. J.A. 139 ("Google's Terms of Service, which a user must accept as part of registering a Google Account, prohibit [their] services from being used in

---

[4] The affidavit Defendant provided reads: "Google's Privacy Policy provides that Google may 'analyze your content to help us detect abuse such as spam, malware, and illegal content.'" J.A. 139. It also states that "[t]he policies and procedures described in [it] are a true and accurate description of those used by Google in September 2019." J.A. 142. Defendant provided this information to the district court and has not disputed its accuracy. However, in preparing its brief, the government realized the link in paragraph 3 links to Google's Privacy Policy as of February 4, 2021, which post-dates Defendant's conduct.

This distinction makes no substantive difference, though, because the same website contains links to archived versions of the Privacy Policy, and the version seemingly in place at the time of Defendant's conduct contains the exact same language: "And we analyze your content to help us detect abuse such as spam, malware, and illegal content." Google's Privacy Policy as of January 22, 2019 (last visited July 10, 2025), available at https://policies.google.com/privacy/archive/20190122?hl=en-US.

violation of the law…and specifically call[] out child pornography as violative content.").[5]

To prevail here, Defendant must prove he had a reasonable expectation of privacy. But he does not dispute that Google specifically told him that it scans for illegal materials and "may…report the violation to appropriate authorities." *See* J.A. 139 (quotation from link in Paragraph 3). He also does not dispute that all the materials Google provided to NCMEC were child pornography in violation of its privacy policy. Like the defendant in *Simons*, he was put on notice that content he transmitted would be monitored. 206 F.3d at 398. And, like the employer in *Simons*, Google did exactly what it told defendant it would do: it looked for child pornography and disclosed it to the authorities. Defendant had no reasonable expectation of privacy in these materials in this account. J.A. 139–140.

Defendant claims that the Second Circuit recently held otherwise, but that opinion did not address the pertinent language from Google's Privacy Policy. *See United States v. Maher*, 120 F.4th 297, 307–09 (2d Cir. 2024); *see also* J.A. 139, Para. 3. Instead, *Maher* relied on more qualified language from Google's Terms of Service. *See Maher*, 120 F.4th at 307 (quoting the Terms of Service provision that Google "may review content to determine whether it is illegal") (internal

---

[5] Defendant provided this information, which he has never challenged. From the government's research, it seems an earlier version of the Terms of Service may have been in place when Defendant committed his crimes. That version stated that Google "may review content to determine whether it is illegal" but did not specify child pornography. Google's Terms of Service as of October 25, 2017 (last visited July 11, 2025), available at https://policies.google.com/terms/archive/20140414-20171025.

quotation marks omitted). It held that "advising users of what the company '*may*
review[]'…did not extinguish [the defendant's] reasonable expectation of privacy." *Id.* at 308 (emphasis added). But even *Maher* implied that things might be
different if Google told "users that it *will* engage in…content review for illegality." *Id.* (emphasis in original).

Here, Google did just that. J.A. 139, Para. 3. Defendant may try to argue
that the provision was worded permissively here too, but it was not. The *affidavit*
he provided included "may" when introducing the relevant language from the
Privacy Policy, but the Policy itself does not. *Compare* J.A. 139, Para. 3
("Google's Privacy Policy provides that Google may 'analyze your content….'") *with* https://policies.google.com/privacy/archive/20210204?hl=en-US ("[W]e analyze your content to help us detect … illegal content.") (link from
J.A. 139, Para. 3). And the use of "may" in Paragraph 3 of the affidavit reads in
context to mean "is authorized to." *See* J.A. 139. Where Defendant was warned
that his content would be analyzed for illegal material, *Maher* is of no moment.

And further, even the permissive "may" should extinguish a reasonable
expectation of privacy. It did in *Young*. 350 F.3d at 1307–08 ("Federal Express
told its customers two things: (1) do not ship cash, and (2) we *may* open and
inspect your packages at our option. As a matter of law, this simply eliminates
any expectation of privacy.") (emphasis added). If a hotel clerk explained at
check-in that staff *may* come into any hotel room to search for child pornography, a would-be guest could not be surprised if that happened. And if the risk

23

was too great, that guest could take his business (and child pornography) else-where. Defendant could have, too.

This position does not speak to the expectation of privacy for innocent materials stored in online accounts. Google made its warning about illegal content clear. It "has a strong business interest in…ensuring its services are free of illegal content, including apparent child sexual abuse material." J.A. 139–140 (highlighting its Transparency Report detailing its "voluntary efforts to remove and report [child sexual abuse material] for many years."). In this context, Defendant cannot reasonably claim surprise that Google monitored his child pornography content. If this risk was unacceptable to him, he could have gotten a digital account somewhere with a less rigorous privacy policy. But he did not.

Google warned Defendant that his account would be analyzed for illegal content. If he nevertheless expected privacy for the child pornography he uploaded there, that expectation was not reasonable. And where there is no reasonable expectation of privacy, there is no illegal search. *See Smith*, 442 U.S. at 740.

> **b.** Law enforcement review of the hash-matched images and videos provided by Google was not a physical intrusion by the government, so it was not a trespass in violation of the Fourth Amendment.

The district court was also correct in finding that Defendant's attempt at a "trespass" theory of unlawful search failed. J.A. 257. As it explained: "a government agent's '***physical intrusion*** of a constitutionally protected area in order

to obtain information . . . may constitute a violation of the Fourth Amendment.'" J.A. 257 (citing *United States* v. *Jones*, 565 U.S. 400, 407 (2012) (emphasis added in district court order)). In *Jones*, law enforcement physically placed a GPS tracker on a subject's car, and the Supreme Court held this amounted to a search. *Id.* at 404.

Here, Defendant bases his trespass argument on *Jones* but overlooks two key distinctions. In *Jones*, the offending action was: (1) a physical intrusion and (2) executed by law enforcement. *Id.* In his brief, Defendant discusses whether there can be a "physical" intrusion in the cyber-world, but the Court need not consider this question here because, even if that is possible, there was no intrusion *by government actors*.

If anyone "trespassed" onto Defendant's account, it was Google—a private actor. Google scanned the files for content, hash-matched them, gathered them, and produced them and their metadata to law enforcement. If any trespass into Defendant's privacy took place, it was *this. See Burdeau v. McDowell*, 256 U.S. 465, 475 ("[W]hatever wrong was done was the act of individuals in taking the property of another."). His account was unaffected by any subsequent inspection of the produced files by law enforcement. As the district court held: "Even under a physical trespass theory, a private party's seizure of an individual's personal effects and subsequent transmission of those effects to the government does not prevent the government from using those materials in a prosecution." J.A. 257 n.6 (citing *Burdeau*, 256 U.S. at 475).

And the private-search doctrine *does* apply to property-based Fourth Argument violations. Defendant is simply incorrect to argue that the private-search exception does not apply to a Fourth Amendment argument based on property rights rather than privacy expectations. *Compare* Brief at 33 *with United States v. Jones*, 565 U.S. 400, 408–09 (2012) ("[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test.") (emphasis in original) (discussing *Katz v. United States*, 389 U.S. 347 (1967)). As the Sixth Circuit has recognized, "[t]he rule that the Fourth Amendment does not protect against private searches" was developed when "the Court was using the earlier 'common-law trespass' approach." *United States v. Miller*, 982 F.3d 412, 433 (6th Cir. 2020). "And the rule applied even when a private party committed a trespass." *Id.* (discussing *Burdeau*, 256 U.S. at 475; *Ex parte Jackson*, 96 U.S. 727, 735 (1877)). There was no unlawful government trespass here.

**2.    Even if law enforcement searched Defendant's files, this did not violate the Fourth Amendment because Google had examined the material first, and law enforcement did not exceed the scope of Google's review.**

Every image law enforcement viewed had already been viewed by a Google employee. Google's hashing process ensured that it had prior knowledge of the images it turned over to law enforcement. By looking at them, law enforcement did not see more than Google had already.

The private search doctrine is an exception to the warrant requirement. It "is based on the principle that the Fourth Amendment does not protect against

searches conducted by private individuals acting in a private capacity." *United States v. Fall*, 955 F.3d 363, 370 (4th Cir. 2020). "And since the Fourth Amendment is not implicated by a private search, it is not violated when the police merely review the same information that was discovered during the private search." *Id.* The justification for this exception "is that when a private party collects evidence of criminality and subsequently presents that evidence to the police, the police need not "avert their eyes." J.A. 245 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 489 (1971)).

The critical inquiry, then, is whether the government "obtained information with respect to which the defendant's expectation of privacy ha[d] not already been frustrated." *United States v. Reddick*, 900 F.3d 636, 638 (2018). And when there is a "'virtual certainty' that a government search will disclose nothing more than what the private party has already discovered," the government search does not exceed the scope of the private search. *United States v. Miller*, 982 F.3d 412, 428 (6th Cir. 2020) (quoting *United States v. Jacobsen*, 466 U.S. 109, 119 (1984)). In short: an "agent's viewing of what a private party ha[s] freely made available for [] inspection [does] not violate the Fourth Amendment." *Jacobsen*, 466 U.S. at 119.

In *Jacobsen*, as relevant here, FedEx employees opened a damaged package to find bags of white powder inside. *Jacobsen*, 466 U.S. at 111. They returned the powder to its packaging and called law enforcement. *Id.* A DEA agent then took everything back out and saw the powder. *Id.* The agent's "removal of the plastic bags…and…visual inspection of their contents enabled the agent to learn

nothing that had not previously been learned during the private search." *Id.* at 120. So, it "infringed no legitimate expectation of privacy and hence was not a 'search' within the meaning of the Fourth Amendment." *Id.* By contrast, in *Walter v. United States*, a plurality of justices found that the Fourth Amendment was violated when law enforcement inspection "exceed[ed] the scope of the private search" by viewing pornographic films that had been turned over by a private party who had only seen their labels' "suggestive drawings" and "explicit descriptions." 447 U.S. 649 (1980).

The Sixth Circuit has found that Google's hash-matching practice was reliable enough to satisfy the "virtual certainty test and trigger[] [the] private-search doctrine." *United States v. Miller*, 982 F.3d 412, 426–30 (6th Cir. 2020). The Court there asked whether "Google's 'electronic' inspection create[d] the same level of certitude as the FedEx employees' 'manual' inspection that the later government search would reveal nothing more than what the private parties had already discovered?" *Id.* at 429. Its answer was yes where the defendant, "who bore the burden of proof, never challenged the reliability of hashing" and the district court "found that the technology was highly reliable—akin to the reliability of DNA." *Id.* at 430 (internal quotation marks omitted). If anything, the "computer's 'virtual' search of a single file create[d] more certainty about the file's contents than a person's 'manual' search of the file," as "[m]ost people who view images do not use a magnifying glass to undertake a pixel-by-pixel inspection." *Id.*

28

The facts here compel the same result. The same "highly reliable" technology was used to ensure that "the later government search would reveal nothing more than what the private part[y] had already discovered." *Id.* at 429. Where there was a "virtual certainty" that Detective Rider's inspection of the files would reveal only material Google had already seen, the Fourth Amendment is not offended.

This is especially true where Defendant did not credibly challenge the reliability of hashing in the district court or here. He mentions reliability in his brief, *see* Brief at 20, but he discusses the human element and protocol, not the accuracy of the technology. And, to the extent he quibbles with the initial determinations, "that is not a type of error that matters under the private search doctrine." *Miller*, 982 F.3d 412, 431. For even if "a private party turns out to be wrong about the legality of an item that the party discloses to police," that "does not mean that the police violate the Fourth Amendment when they reexamine the item." *Id.* And Defendant has provided nothing to warrant a "definite and firm conviction that a mistake has been committed.'" *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021) (quoting *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012)). Without that, the district court's detailed and well-supported findings about the reliability of hashing are entitled to great deference. *See* J.A. 239–240 ("[S]uffice it to say that if two images share the same hash value, they are identical, bit-for-bit.") (internal quotations marks omitted).

Defendant relies on *United States v. Wilson* from the Ninth Circuit. Brief at 15; 13 F.4th 961 (9th Cir. 2021). *Wilson* held that the law enforcement viewing

of hash-matched images in that case exceeded Google's actions because at that time, "no identified Google employee 'knew and could say' what those images showed." *Id.* at 972. But the private search doctrine does not require the private party to keep the offending item or maintain a meticulous descriptive account of it. All the private search doctrine requires is a virtual certainty that law enforcement will see only what the private party has seen, and hash matching provides that. *See Jacobsen*, 466 U.S. at 119. By the very nature of hashing, we know that Google had already examined each of these images and videos—otherwise, there would be no hash value to compare. So, even without opening all 156 files when they were found in Defendant's account, Google could be sure it had examined each of them before, and law enforcement's opening any of those files could not exceed the private search.[6]

*Wilson* holds that this does not matter because Fourth Amendment rights are personal to each defendant, so "whether Google had previously reviewed, at some earlier time, *other individuals'* files is not pertinent." *Id.* at 975 (emphasis in original). The Court in *Wilson* writes that this is like law enforcement searching one house and finding evidence of wrongdoing and a note indicating someone else has identical documents in their home and going to seize them without a warrant. *Id.* It is not. Instead, this is like a private party going into that second house (after warning the resident it would), taking only the material it warned

---

[6]  *See* J.A. 240 ("If a hash search has any shortcomings, as it relates to identifying contraband, it is that a hash search may be ***too*** precise. To that point, if a single pixel within an image has been altered, the image will be represented by a hash value distinct from its unaltered version.") (emphasis in original).

the resident it would take, and then providing that material to law enforcement with the assurance that it is the exact same material they have already seen *and nothing else*. The Ninth Circuit's hypothetical offends because it involves a warrantless intrusion into a space where previously-unseen materials may also be examined, but this is not the reality of hash-matching. Hashing provides the "virtual certainty" the law seeks. *See Miller*, 982 F.3d at 429–30. Because law enforcement only saw files that Google had seen first, the private search doctrine applies.

## II.  Even if the initial viewing of the images was unlawful, the district court was still right to deny the motion to suppress because law enforcement acted in good faith, and the ultimate evidence was attenuated from any error.

### A.  Standard of Review.

In reviewing the denial of a motion to suppress, the Court reviews legal conclusions de novo and factual findings for clear error, taking the evidence in the light most favorable to the government. *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021). A court conducting clear-error review "'may not reverse a lower court's finding of fact simply because it would have decided the case differently.'" *Id.* (quoting *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012)). Rather, it "'must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Wooden*, 693 F.3d at 451).

31

**B.    Discussion of Issue.**

**1.    Warrantless inspection of the files was consistent with statutory and case law, so law enforcement acted in good faith.**

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). Excluding evidence should be a court's "last resort." *Id.* Accordingly, district courts should only suppress evidence—even illegally obtained evidence—where it results in appreciable deterrence and not when an officer acts in an objectively reasonable manner. *United States v. Maher*, 120 F. 4th 297, 320 (2d Cir. 2024) (internal quotation marks and citations omitted).

This "good faith exception" to the exclusionary rule usually applies when a searching officer relies on a warrant, but it can also apply when officers act without a warrant "under circumstances that 'they did not reasonably know, at the time [were] unconstitutional.'" *Id.* at 321 (alteration in original); *see also Davis v. United States*, 564 U.S. 229, 239 (2011) (discussing extensions to the good-faith exception outside the warrant context).

In *Maher*, the Second Circuit, when met with a similar factual scenario, found that a Fourth Amendment violation had occurred but that the good faith exception applied.[7] *See United States v. Maher*, 120 F.4th 297 (2d Cir. 2024). It

---

[7] As discussed above, the United States does not agree that *Maher's* substantive holding applies here because *Maher* did not consider the language in

asked: how reasonable was the officer's belief that no warrant was required in those circumstances at that time? *Id.* at 321. And it answered: around July 2020, the investigator who viewed the files from the defendant's account "had a reasonable basis to believe she did not need a warrant to do so." *Id.* At that time, the only Court of Appeals to have taken on the question of whether a warrant was required in these circumstances had answered no, so it was "objectively reasonable for [the investigator] to think that she did not need a warrant to visually examine the [] file image reported by Google as 'apparent child pornography'" based on its previous review and hash matching. *Id.*; *see United States v. Reddick*, 900 F.3d 636, 640 (5th Cir. 2018) ("The government learned nothing from [the detective's] viewing of the files that it had not already learned from the private search.").

Here, Detective Rider examined Defendant's child pornography two months before the investigator in *Maher*, so the legal landscape was similar. The only Court of Appeals to have considered the issue had authorized warrantless examination. *See Reddick*, 900 F.3d at 639.

Moreover, as the district court held below, NCMEC is statutorily required to "make available" reports of child pornography to law enforcement, and that information "could hardly be considered 'available' to law enforcement if [they] could only review its contents after obtaining a search warrant." J.A. 258 n.7.

---

the Privacy Policy that the government relies on here. *Maher*, 120 F.4th at 307–09. Also, in *Maher*, no one at Google or NCMEC viewed any files sent from the defendant's account. *Id.* at 303–04; *see* Section III, below. But *Maher* still found good faith. *Id.* at 321.

33

Where a statute required that reports of child pornography be made available to law enforcement (and especially when the only appellate court to rule on the issue of warrantless inspection had authorized it), Detective Rider acted in good faith when she reviewed Defendant's images.

Even if the Court finds this argument a close call, it is far from "culpable enough to be worth the price paid by the justice system." J.A. 259 (quoting *Davis*, 564 U.S. at 240). Because law enforcement acted in good faith, the "harsh sanction of exclusion" should not apply. J.A. 259 (quoting *Davis*, 564 U.S. at 240).

### 2. The evidence in this case was attenuated from the initial examination by months and intervening events, including multiple consensual encounters.

Exclusion of evidence is "applicable only … where its deterrence benefits outweigh its substantial social costs." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (internal quotation marks omitted). Accordingly, the exclusionary rule does not apply where "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Id.* at 238. That causal connection "may [] become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939); *see also* J.A. 247.

"[T]he … question ... is whether … the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal quotation marks omitted); *see also* J.A. 247. And evidence is not necessarily "fruit of the poisonous tree" just because the officers would not have

34

learned of the information but for their illegal actions "if it is somehow attenuated enough from the violation." *Id.* at 487–88; *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002). Because the specific facts matter, the district court is in the best position to decide this issue. *Najjar*, 300 F.3d at 478.

When considering attenuation, the Supreme Court has considered three factors: (1) the temporal proximity between the purportedly illegal conduct and the evidence; (2) the presence or absence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct, which is "particularly" significant. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975). This is a balancing test that "does not require that each of the factors set forth be resolved in favor of the Government." *United States v. Seidman*, 156 F.3d 542, 549 (4th Cir. 1998).

In *Brown*, police officers were waiting for the defendant at his home, guns drawn. *Brown*, 422 U.S. at 592. They ordered him against a wall, searched him, handcuffed him, arrested him for murder, escorted him to a squad car, and drove him twenty minutes to a precinct, attempting to question him. *Id.* at 593–94. Upon arrival, they left him in an interrogation room before *Mirandizing* him and questioning him about the murder at issue. *Id.* at 594. Later that night, they interrogated him again. *Id.* at 595.

Brown moved to suppress his statements as taken in violation of his constitutional rights. The Supreme Court agreed. *Id.* at 603–04. As to temporal proximity, "Brown's first statement was separated from his illegal arrest by less than two hours." *Id.* at 604. As to the second factor, "there was no intervening event of significance." *Id.* And regarding flagrancy, the Supreme Court held that the

"illegality … had a quality of purposefulness. The impropriety of the arrest was obvious" and gave "the appearance of having been calculated to cause surprise, fright, and confusion." *Id.* at 605. In these circumstances, the *Miranda* warnings were not enough to dissipate the taint of the unlawful arrest. *Id.*

Here, all three factors support attenuation. First, the evidence in this case is the result of a consensual interview and residential search warrant in December 2020—more than six months after the alleged violation. This is orders of magnitude longer than the two hours found insufficient in *Brown.* It is also orders of magnitude longer than temporal gaps that *have* been long enough to dissipate the taint. *See Wong Sun v. United States*, 371 U.S. 471, 491 (1963) (holding that a confession given "voluntarily several days later" was "so attenuated [from unlawful arrest] as to dissipate the taint.") (internal quotation marks omitted); *see also United States v. Hooker*, 54 F.3d 774, *2 (4th Cir. 1995) (unpublished) ("An hour passed between the two searches.").

Second, there were intervening events of significance, including multiple consensual encounters and searches that led to new evidence all their own. Detective Rider did physical surveillance at Defendant's parents' house over a period of months to discern who lived there. J.A. 148. She ran the name "Harvard Eperstein" through multiple law enforcement databases, finding nothing. J.A. 149; *see also* J.A. 147. She spoke to Defendant's parents, who told her he had moved to Raleigh, North Carolina, and provided access to his contact information there. J.A. 149–150. They also gave permission for law enforcement to look through their cell phones, which revealed no child pornography. J.A. 150.

Then, law enforcement in North Carolina met with Defendant at his home for a consensual interview where he denied downloading child pornography at his parents' home. J.A. 222. This denial itself suggests an exercise of free will and lack of coercive pressure. *See Najjar*, 300 F.3d at 478 n.2. In this meeting, Defendant also gave informed, written consent to search his laptop and cell phone. J.A. 211, J.A. 222–223. He was told he could withdraw that consent at any time and assured law enforcement he had means to do so if desired. J.A. 211, J.A. 222–223. He never did. *See* J.A. 174.

That consensual search revealed more child pornography. J.A. 223. These files (and the indication that Defendant had an external hard drive that he did not mention to law enforcement) were used as the most recent basis for probable cause in a search warrant for Defendant's apartment that also included descriptions of three files from an earlier warrant by Detective Rider. J.A. 220–224. Then, at another consensual interview, Defendant admitted to downloading child pornography in Virginia and bringing it to North Carolina. J.A. 176.

The "substantial investigative effort unconnected to the" alleged violation supports the second factor for attenuation. *See Najjar*, 300 F.3d at 478–79. Even if Detective Rider opening files beyond those opened by Google in this case "in some slight way was a but-for cause of the later searches," the subsequent, months-long, multi-faceted "investigation and the intervening circumstances were sufficient to break the causal link between any primary illegality and later obtained evidence." *See id.* at 479. Specifically, Defendant's repeated consent

can "sever the connection between an unlawful act and the acquisition of additional evidence [because] voluntary consent is the quintessential act of free will." *United States v. Seidman*, 156 F.3d 542, 549 n.10 (4th Cir. 1998); J.A. 247; *see also Hooker*, 54 F.3d 774 at *2 ("Hooker's voluntary action…stating…that the agents could enter the home…served as an intervening circumstance between the two searches.").

And as to the third factor, the taint itself is "slight" where the alleged violation "lacks the element of overt police coercion." *Seidman*, 156 F.3d at 549. It is helpful to remember what the alleged violation here is: Detective Rider, sitting in her office, clicking on images and videos she knows (1) have previously been opened by a private actor and (2) are child pornography and nothing more, and then getting a search warrant as a result. Her purpose in doing so "can only be described as a general law enforcement purpose," and her decision of which files to view "appears to have been [] arbitrary." J.A. 261. This alleged violation "pales in comparison to other cases where evidence has been held inadmissible on Fourth Amendment grounds." *Seidman*, 156 F.3d at 550 (citing *Wong Sun v. United States*, 371 U.S. 471, 486 (1963) ("Six or seven officers had broken the door and followed on [the defendant's] heels into the bedroom where his wife and child were sleeping. He had been almost immediately handcuffed and arrested.")). Where the "degree of coercion resulting from police officers' illegal acts in *Wong Sun* and *Brown v. Illinois*" is not present, the third factor weighs against suppression. *Seidman*, 156 F3d. at 550.

At bottom, attenuation asks whether the evidence at issue came via "exploitation" of an alleged illegality. *Wong Sun*, 371 U.S. at 488. Here, the allegedly wrongful step was Detective Rider's review of files beyond those reviewed by Google. But Google opened 31 of Defendants' files, as allowed by the Fourth Amendment. *United States v. Richardson*, 607 F.3d 357, 364 (4th Cir. 2010) ("The Fourth Amendment … does not protect against searches, no matter how unreasonable, conducted by private individuals acting in a private capacity.") (internal quotation marks omitted); *see also* Brief at 16 (citing *United States v. Jeffery*, No. 23-4264, 2024 WL 4866686, *8–11 (4th Cir. 2024) (unpublished)). And there is no dispute that law enforcement could have opened those same 31 files without violating Defendant's rights.[8] *See* Brief at 19 ("Had Google opened the file, Lowers's expectation of privacy would have been frustrated and at an end.") (internal quotation marks omitted); *see also* J.A. 261 ("Defendant acknowledges that, if Detective Rider had instead viewed images from among the 31 images that the Google employee had inspected…the entire basis for the motion to suppress would be undermined."). And the contents of those 31 files would have established probable cause for a search warrant of Defendant's Google account and his parents' house (this address was known from an administrative subpoena that Defendant has never challenged), which would have allowed the investigation to continue on as it did.

---

[8]  The record suggests Detective Rider may have viewed all the images, including the 31 opened by Google. *See* Section III, below.

Or, even if she did not open any of the images, Detective Rider could have gone to the Lowers home and spoken to Defendant's parents, and the investigation could have continued from there as it did. Even without the search warrant results, she would have known Google sent 156 images that they had identified as child pornography. There is no indication Defendant's parents would not have spoken with law enforcement or withheld permission to examine their cell phones. J.A. 149–150. That information would still have led to Defendant.

Then, when speaking with Defendant, law enforcement could have confronted him with the 31 images Google had opened. Where all of Defendant's files were obvious child pornography, there is no reason to believe confronting him with only the images Google had already opened would have led to a different result. *See* J.A. 170, J.A. 251. So, he still would have consented to a search of his devices, and that would have led to new child pornography. J.A. 222–223. And it was that new material that led to a second consensual interview with Defendant where he admitted to downloading child pornography and bringing it to North Carolina, as well as providing probable cause for a search warrant where even more child pornography was found. J.A. 174–178. And *that* is the evidence in this case.

This counterfactual shows that Detective Rider's opening of images beyond the 31 opened by Google didn't really do anything for the investigation. It is not how law enforcement identified Defendant; they would have found him anyway. It is also not how law enforcement found the child pornography he was charged with; they would have found it anyway. The connection between the

40

alleged wrong and the evidence in this case is weak, and the arguments for each attenuation factor are strong. The evidence was attenuated from any error.

## III.   If this Court disagrees with the arguments above, it should remand for an evidentiary hearing.

### A.   Standard of Review.

"When a trial court makes insufficient findings of fact, an appellate court may tailor a remedy appropriate to the case, including remanding the case for further development." 5 Am. Jur. 2d Appellate Review § 705.

### B.   Discussion of Issue.

If the Court has authority to find that a motion to suppress was improperly denied and vacate a conviction, it also has the power to impose a lesser remedy of requiring the district court to consider additional evidence. If the Court is unpersuaded by the arguments above, it should remand for additional factual findings about which images Detective Rider reviewed or whether the warrant affidavit had sufficient probable cause without the image description.

First, Courts of Appeals have "broad remand powers, including the entry of 'appropriate' judgments or 'further proceedings' that may be 'just under the circumstances.'" *United States v. Mandel*, 591 F.2d 1347, 1371 (4th Cir.), *on reh'g*, 602 F.2d 653 (4th Cir. 1979) (quoting 28 U.S.C. § 2106). The Eleventh Circuit explained that "the text of [28 U.S.C. § 2106] grants the broadest authority to the courts of appeals in fashioning the remedy," and we cannot imagine how the

appellate court's discretion could be framed more broadly." *United States v. Martinez*, 606 F.3d 1303, 1304 (11th Cir. 2010). This broad remedial power allows the district court to further develop a correct factual record.

Second, courts of appeals have ordered such mandates for motions to suppress. *See, e.g., United States v. Sanders*, 954 F.2d 227, 231 (4th Cir. 1992) ("This issue is so fact-laden that the case must be remanded to the district court to enable that court to conduct, if necessary, a new suppression hearing, at which it must make factual findings and conclusions on the key issue …"); *see also United States v. Clark*, 935 F.3d 558, 572 (7th Cir. 2019) ("We REVERSE the district court's denial of Clark's motion for a *Franks* hearing without an evidentiary hearing. We VACATE the district court's judgment and REMAND for a *Franks* hearing and appropriate action based on the outcome of that hearing, either granting Clark's motion to suppress or, if his motion is denied, reinstating the convictions and sentence. If the judgment is reinstated, the denial of Clark's motion to suppress and the district court's sentence are AFFIRMED."); *United States v. DiCesare*, 765 F.2d 890, 901 (9th Cir.), amended, 777 F.2d 543 (9th Cir. 1985) ("We . . . vacate Flannery's conviction and remand for an evidentiary hearing on whether the officers complied with the knock and announce statute during both the August and September entries. Since we find no merit to any of Flannery's other assigned errors, if the district court finds after a hearing that the officers complied with the statute or that their compliance was excused, the district court may re-enter her conviction.").

Here, even if Defendant is correct that the private-search doctrine cannot apply to files only hash-matched but not reviewed, Google provided 31 child pornography files to law enforcement that it did review. J.A. 132–133. This Court should remand to the district court for a hearing to determine whether these images make exclusion inappropriate.

In Defendant's motion to suppress, he admitted that it was "[c]rucial[]" to his claim that Detective Rider viewed three files other than the 31 reviewed by Google.[9] J.A. 85. So, the logic—and district court holding—goes, if Detective Rider "had instead viewed images from among the 31," she would not have impermissibly exceeded the private search, and "the entire basis for the motion to suppress would be undermined." J.A. 261. Because the parties relied on their legal arguments in the district court, the question of whether Detective Rider had viewed the 31 images Google had opened was not squarely before the district court. J.A. 234–237.

But the record leaves open the possibility that Detective Rider reviewed these images.[10] The district court noted this ambiguity. J.A. 242 n.2 (explaining

---

[9]   Defendant bases this claim on Detective Rider's description of three video files in her report which were not among the 31 opened by Google. *Compare* J.A. 146 *with* J.A. 96–129; *see also* Brief at 5.

[10]   In fact, the record suggests that Detective Rider reviewed all the images, including the 31 Google reviewed. In her report, she says she "reviewed … the images uploaded by the suspect" and found them to be "sexually explicit images and videos depicting pre-pubescent minors engaging in sexual acts." J.A. 146. Her warrant affidavit says she reviewed "the uploaded image [sic]/videos" and "found sexually explicit images and videos involving pre-

that the warrant affidavit "suggests that the detective viewed more than 3 of the 156 images, and may have viewed one or more of the 31 images viewed by the Google employee"). If Detective Rider had reviewed all or some of the 31 images, and they contained child pornography, this would likely support a finding of inevitable discovery. *See, e.g., Nix. v. Williams*, 467 U.S. 431, 440–48 (1984) (explaining that the inevitable-discovery doctrine exists so that the government will not be worse off if it did not commit a violation). Assuming it was an unlawful search for Detective Rider to look at the 125 images that Google hash-matched but had not reviewed, Detective Rider almost certainly would have based her search warrant on the 31 images that Google had reviewed. But this presents a question of fact for the district court to resolve after an evidentiary hearing.

In addition, the district court did not resolve whether the warrant would have been sufficient with the allegedly-unlawful information excised. J.A. 183. When evaluating a search warrant "based in part on information obtained through an illegal search," "the correct course [is] to set aside the suspect material and make a probable cause evaluation based on what remain[s] of the affidavit." *See United States v. Gillenwaters*, 890 F.2d 679, 681–82 (4th Cir. 1989) (finding "that the totality of the circumstances presented in the untainted portion

---

pubescent minors engaging in sexual acts." J.A. 155. She then goes on to describe one file which, notably, is not one of the three summarized in her report. J.A. 155.

of the affidavit supports a finding of probable cause to issue the search warrant."). The government raised this argument below, but the district court did not reach it. It could on remand, and it should have the opportunity to do so before this Court makes any adverse ruling.

If the Court cannot affirm on the reasons above, it should at least remand for additional factual findings.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted, this 21st day of July, 2025.

DANIEL P. BUBAR
*Acting United States Attorney*


BY:   <u>*/s/ Lucy Partain Brown*</u>
       LUCY PARTAIN BROWN
       *Assistant United States Attorney*
       150 Fayetteville Street, Suite 2100
       Raleigh, North Carolina 27601
       Telephone: 919-856-4530

DAVID A. BRAGDON
*Assistant United States Attorney*

*Of Counsel*

# CERTIFICATE OF COMPLIANCE

1.  Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief meets the page or type-volume limits of Rule 32(a) because, exclusive of the portions of the document exempted by Rule 32(f), this brief contains:

    ☐ _____ Pages *(may not exceed 30 pages for a principal brief or 15 pages for reply brief, pursuant to Rule 32(a)(7)(A))*; or

    ☒ 11,427 Words *(may not exceed 13,000 words for a principal brief or 6,500 words for reply brief, pursuant to Rule 32(a)(7)(B))*.

2.  Further, this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 2016 using fourteen-point *Calisto MT*, a proportional-width typeface.

_/s/ Lucy Partain Brown_____
LUCY PARTAIN BROWN
*Assistant United States Attorney*